LEVAL, *Circuit Judge*, concurring only in the judgment:

The majority opinion deals a substantial blow to international law and its undertaking to protect fundamental human rights. According to the rule my colleagues have created, one who earns profits by commercial exploitation of abuse of fundamental human rights can successfully shield those profits from victims' claims for compensation simply by taking the precaution of conducting the heinous operation in the corporate form. Without any support in either the precedents or the scholarship of international law, the majority take the position that corporations, and other juridical entities, are not subject to international law, and for that reason such violators of fundamental human rights are free to retain any profits so earned without liability to their victims.

Adoption of the corporate form has always offered important benefits and protections to business – foremost among them the limitation of liability to the assets of the business, without recourse to the assets of its shareholders. The new rule offers to unscrupulous businesses advantages of incorporation never before dreamed of. So long as they incorporate (or act in the form of a trust), businesses will now be free to trade in or exploit slaves, employ mercenary armies to do dirty work for despots, perform genocides or operate torture prisons for a despot's political opponents, or engage in piracy – all without civil liability to victims. By adopting the corporate form, such an enterprise could have hired itself out to operate Nazi extermination camps or the torture chambers of Argentina's dirty war, immune from civil liability to its victims. By protecting profits earned through abuse of fundamental human rights protected by

international law, the rule my colleagues have created operates in opposition to the objective of international law to protect those rights.

Since *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), was decided in 1980, United States courts, acting under the Alien Tort Statute (ATS),[1] which was passed by the First Congress in 1789, have been awarding compensatory damages to victims of human rights abuses committed in violation of the law of nations. Many supporters of the cause of human rights have celebrated the *Filartiga* line of cases as an important advance of civilization. Not all, however, have viewed those cases with favor. Some see them as unwarranted meddling by U.S. judges in events that occurred far away, applying a body of law that we did not make, in circumstances carrying a potential, furthermore, to interfere with the President's conduct of foreign affairs. *See, e.g.*, *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 805 (D.C. Cir. 1984) (Bork, J., concurring).[†] In 2004, a substantial minority of the Supreme Court, in *Sosa v. Alvarez-Machain*, 542 U.S. 692, would have essentially nullified the ATS and overturned the *Filartiga* line, by ruling that the ATS did no more than give courts jurisdiction, and that, absent further legislation establishing a legal claim, courts acting under ATS had no authority to grant any substantive

---

[1] "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

[†] My colleagues call my identification of Judge Robert Bork as the author of this opinion a "stratagem" or "rhetorical ploy." It is not. In *Tel-Oren*, the three judges of the District of Columbia Circuit panel each wrote separate concurring opinions. By identifying the authors in citing to *Tel-Oren* concurrences, I simply follow the conventional method of distinguishing between separate opinions in the same case. The Supreme Court did the same, *see Sosa v. Alvarez-Machain*, 542 U.S. 692, 728, 732 & n.20 (2004), and so does the majority opinion here.

relief. The majority of the Supreme Court, however, rejected that argument. The Court ruled that under the ATS, federal courts could award damages for violations of the law of nations. For those who believe the *Filartiga-Sosa* line represents a meaningful advance in the protection of human rights, the majority's decision here marks a very bad day.

To understand this controversy, it is important to understand exactly what is the majority's rule, how it functions, and in what circumstances. To begin, their rule relates to the most abhorrent conduct – those acts that violate norms of the international law of human rights. The ATS gives U.S. courts jurisdiction to award tort damages to aliens who are victims of such atrocities. According to the majority, in cases where the norms of the law of nations were violated by a corporation (or other juridical entity), compensatory damages *may be awarded under the ATS against the corporation's employees*, natural persons who acted in the corporation's behalf, *but not against the corporation* that commanded the atrocities and earned profits by committing them. The corporation, according to my colleagues, has not violated international law, and is indeed incapable of doing so because international law does not apply to the conduct of corporations. Accordingly, a corporation which has earned profits by abuse of fundamental human rights – as by slave trading – is free to retain those profits without liability.

While my colleagues see nothing strange or problematic in this conclusion, their position is that in any event they have no responsibility for it. They invoke the rule simply because, in their contention, it is commanded by the law of nations.

But there is no basis for this contention. No precedent of international law endorses this

rule. No court has ever approved it,[*] nor is any international tribunal structured with a jurisdiction that reflects it. (Those courts that have ruled on the question have explicitly rejected it.) No treaty or international convention adopts this principle. And no work of scholarship on international law endorses the majority's rule. Until today, their concept had no existence in international law.

The majority contend, nevertheless, that unambiguous jurisprudence "lead[s] inescapably" to their conclusion. Maj. Op. 17. However, the reasoning that supports the majority's argument is, in my view, illogical, misguided, and based on misunderstandings of precedent.

The argument depends on its observation that international *criminal* tribunals have been established without jurisdiction to impose *criminal punishments* on corporations for their violations of international law. From this fact the majority contend an inescapable inference arises that international law does not govern corporations, which are therefore free to engage in conduct prohibited by the rules of international law with impunity.

There is no logic to the argument. The reasons why international tribunals have been established without jurisdiction to impose *criminal* liability on corporations have to do solely

---

[*] Since the writing of this opinion, in the few days before filing, a California district court dismissed an ATS action in part on the basis of its acceptance of the majority's view that customary international law does not apply to corporations. *Doe v. Nestle, S.A.*, No. CV 05-5133 SVW (JTLx), slip op. at 120 (C.D. Cal. Sept. 8, 2010). To the extent I note in various places throughout this opinion that no court has ever spoken favorably of the majority's proposition that corporations are exempt from the rules of international law, I modify that statement to except the opinion filed last week in California.

with the theory and the objectives of *criminal punishment*, and have no bearing on civil compensatory liability. The view is widely held among the nations of the world that criminal punishments (under domestic law, as well as international law) are inappropriate for corporations. This view derives from two perceptions: First, that criminal punishment can be theoretically justified only where the defendant has acted with criminal intent – a condition that cannot exist when the defendant is a juridical construct which is incapable of having an intent; and second, that criminal punishments are pointless and counterproductive when imposed on a fictitious juridical entity because they fail to achieve the punitive objectives of criminal punishment. For these reasons many nations in their domestic laws impose criminal punishments only on natural persons, and not on juridical ones. In contrast, the imposition of civil liability on corporations serves perfectly the objective of civil liability to compensate victims for the wrongs inflicted on them and is practiced everywhere in the world. The fact that international tribunals do not impose *criminal punishment* on corporations in no way supports the inference that corporations are outside the scope of international law and therefore can incur no *civil compensatory liability* to victims when they engage in conduct prohibited by the norms of international law.

The majority next contend that international law does not distinguish between criminal and civil liability. This is simply incorrect. International law distinguishes clearly between them and provides differently for the different objectives of criminal punishment and civil compensatory liability.

The majority then argue that the absence of a universal practice among nations of imposing civil damages on corporations for violations of international law means that under international law corporations are not liable for violations of the law of nations. This argument is as illogical as the first and is based on a misunderstanding of the structure of international law. The position of international law on whether civil liability should be imposed for violations of its norms is that international law takes no position and leaves that question to each nation to resolve. International law, at least as it pertains to human rights, consists primarily of a sparse body of norms, adopting widely agreed principles prohibiting conduct universally agreed to be heinous and inhumane. Having established these norms of prohibited conduct, international law says little or nothing about how those norms should be enforced. It leaves the manner of enforcement, including the question of whether there should be private civil remedies for violations of international law, almost entirely to individual nations. While most nations have not recognized tort liability for violations of international law, the United States, through the ATS, has opted to impose civil compensatory liability on violators and draws no distinction in its laws between violators who are natural persons and corporations. The majority's argument that national courts are at liberty to award civil damages for violations of international law solely against natural persons and not against corporations has no basis in international law and, furthermore, nullifies the intention of international law to leave the question of civil liability to be decided separately by each nation.

The majority's asserted rule is, furthermore, at once internally inconsistent and incompatible with Supreme Court authority and with our prior cases that awarded damages for

violations of international law. The absence of a universally accepted rule of international law on tort damages is true as to defendants who are natural persons, as well as to corporations. Because international law generally leaves all aspects of the issue of civil liability to individual nations, there is no rule or custom of international law to award civil damages in any form or context, either as to natural persons or as to juridical ones. If the absence of a universally accepted rule for the award of civil damages against corporations means that U.S. courts may not award damages against a corporation, then the same absence of a universally accepted rule for the award of civil damages against natural persons must mean that U.S. courts may not award damages against a natural person. But the majority opinion concedes (as it must) that U.S. courts may award damages against the corporation's employees when a corporation violates the rule of nations. Furthermore, our circuit and others have for decades awarded damages, and the Supreme Court in *Sosa* made clear that a damage remedy does lie under the ATS. The majority opinion is thus internally inconsistent and is logically incompatible with both Second Circuit and Supreme Court authority.

If past judges had followed the majority's reasoning, we would have had no Nuremberg trials, which for the first time imposed criminal liability on natural persons complicit in war crimes; no subsequent international tribunals to impose criminal liability for violation of international law norms; and no judgments in U.S. courts under the ATS, compensating victims for the violation of fundamental human rights.

The rule in cases under the ATS is quite simple. The law of nations sets worldwide norms of conduct, prohibiting certain universally condemned heinous acts. That body of law, however,

7

takes no position on whether its norms may be enforced by civil actions for compensatory damages. It leaves that decision to be separately decided by each nation. *See infra* Part III.B. The ATS confers on the U.S. courts jurisdiction to entertain civil suits for violations of the law of nations. In the United States, if a plaintiff in a suit under the ATS shows that she is the victim of a tort committed in violation of the norms of the law of nations,[2] the court has jurisdiction to hear the case and to award compensatory damages against the tortfeasor. That is what the Supreme Court explained in *Sosa*. No principle of domestic or international law supports the majority's conclusion that the norms enforceable through the ATS – such as the prohibition by international law of genocide, slavery, war crimes, piracy, etc. – apply only to natural persons and not to corporations, leaving corporations immune from suit and free to retain profits earned through such acts.[3]

* * * * *

I am in full agreement that *this* Complaint must be dismissed. It fails to state a proper

---

[2] The majority concede that "federal courts may recognize claims 'based on the present-day law of nations.'" Maj. Op. 17. Where their opinion departs from precedent is its contention that courts may not recognize a claim against "a particular class of defendant" unless international tribunals regularly impose liability on that type of defendant. Maj. Op. 20, 49, 51. As I explain below, there is no legal basis for this novel requirement.

[3] The majority protest that their rule is not one of "immunity" but rather one of absence of liability. Maj. Op. 50. Because their rule provides that, when a corporation is sued, it can have the suit dismissed on the ground that it is a corporation, it seems to me to be indistinguishable from an immunity. But nothing turns on whether we call it an immunity, an exemption, a protection, an absence of liability, or any other name. My reasons for rejecting the rule are that there is no support or justification for it in precedent, scholarship, reason, experience, or morality. None of this would change if the rule were called by a different name.

8

legal claim of entitlement to relief. The Complaint alleges that the Appellants – the parent holding companies at the apex of the huge Royal Dutch Shell international, integrated oil enterprise – are liable under the ATS on the theory that their actions aided the government of Nigeria in inflicting human rights abuses on the Ogoni peoples in the jungles of Nigeria. The allegations fall short of mandatory pleading standards. We recently held in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009), that liability under the ATS for *aiding and abetting* in a violation of international human rights lies only where the aider and abettor acts *with a purpose* to bring about the abuse of human rights. Furthermore, the Supreme Court ruled in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), that a complaint is insufficient as a matter of law unless it pleads specific facts supporting a plausible inference that the defendant violated the plaintiff's legal rights. Putting together these two rules, the complaint in this action would need to plead specific facts that support a plausible inference that the Appellants aided the government of Nigeria *with a purpose* to bring about the Nigerian government's alleged violations of the human rights of the plaintiffs. As explained in greater detail below, *see infra* Part VII, the allegations of the Complaint do not succeed in meeting that test. I therefore agree with the majority that the claims against the Appellants must be dismissed, but not on the basis of the supposed rule of international law the majority have fashioned.

I. **The improbability that the humanitarian law of nations, which is based in moral judgments reflected in legal systems throughout world and seeks to protect fundamental human rights, would espouse a rule which undermines that objective and lacks any logical justification**

*A. The opposition of the majority's rule to the objectives of international law.* Rules of

9

international law are not, like rocks, mountains, and oceans, unexplained natural phenomena found on the surface of the earth. The rules of international law have been created by a collective human agency representing the nations of the world *with a purpose to serve desired objectives.* Those rules express the consensus of nations on goals that are shared with virtual unanimity throughout the world.[4] Prior to World War II, the enforcement of international law focused primarily on relations among States and problems relating to the sovereign interests of States. It involved, for example, the inviolability of ambassadors in foreign lands, safe conducts, and the outlawing of piracy, which threatened the shared interest of all nations in trade on the high seas. *See Sosa*, 542 U.S. at 715, 720. Worldwide revulsion at the Nazi atrocities in the period of World War II, however, focused attention on humanitarian values – values so fundamental that they were seen as shared by the "civilized nations" of the world. *Filartiga*, 630 F.2d at 881. Beginning with the Nuremberg trials, the focus of international law thus broadened beyond practical concerns of sovereign nations toward universally shared moral objectives. Acts so repugnant that they violated the morality shared by the civilized world were recognized as violations of international law. The law of nations thus came to focus on humanitarian, moral concerns, addressing a small category of particularly "heinous actions – each of which violates definable, universal and obligatory norms" – conduct so heinous that he who commits it is

---

[4] *See The Amy Warwick*, 67 U.S. (2 Black) 635, 670 (1862) ("The law of nations is also called the law of nature; it is founded on the common consent as well as the common sense of the world. It contains no . . . anomalous doctrine."); Oscar Schachter, *International Law in Theory and Practice* 2 (1991) ("[I]nternational law . . . is more than a given body of rules and obligations. It involves purposive activities undertaken by governments, directed to a variety of social ends.").

rendered "*hostis humani generis*, an enemy of all mankind." *Sosa*, 542 U.S. at 732 (quoting *Filartiga*, 630 F.2d at 890, and *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 781 (D.C. Cir. 1984) (Edwards, J., concurring)). These acts are generally understood to include such extreme, universally condemned conduct as genocide, exploitation of slaves, war crimes, and, in certain circumstances, imprisonment without cause and torture.[5] The law of nations undertakes an emphatic stance of opposition to such acts.

The majority's interpretation of international law, which accords to corporations a free pass to act in contravention of international law's norms, conflicts with the humanitarian objectives of that body of law. In order to understand the majority's rule, I explore a handful of concrete examples of how it would operate. Because the liability, if any, of a corporation for violations of international law is likely to arise in two somewhat different contexts – that in which the corporation *itself* inflicts humanitarian abuses, and that in which the corporation *aids and abets* a local government's infliction of the abuses – and because the pertinent considerations in these two circumstances are somewhat different, I discuss them separately.

*1) Direct commission of heinous offenses by corporations*

*a) Slave trading and exploitation of slaves.* Among the focuses of the Nuremberg trials

---

[5] *See, e.g.*, *Sosa*, 542 U.S. at 732, 737 (torture, slave trade, prolonged arbitrary detention committed as a matter of state policy, and piracy); *Kadic v. Karadzic*, 70 F.3d 232, 240, 243 (2d Cir. 1995) (genocide, war crimes, and torture and summary execution committed in the course of genocide or war crimes); *In re Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994) (torture); *see also* Restatement (Third) of the Foreign Relations Law of the United States § 404 (1987) (genocide, war crimes, piracy, slave trade, and attacks on or hijacking of aircraft).

11

was the exploitation of slave labor by the I.G. Farbenindustrie Aktiengesellschaft ("Farben") and other German companies. The Farben corporation itself was not on trial, as the proceeding was brought solely against its executives for their complicity in the offenses committed by the corporation. Nevertheless, the tribunal found that Farben's program of exploitation of slave labor violated the standards of international law.[6] Because the Nuremberg tribunal was established with only criminal, and not civil, jurisdiction, it never contemplated imposing civil liability on offenders. No civil proceedings of any kind were brought in that tribunal by the victims of Farben's violations against either natural or juridical persons.[7] The question thus did not arise at

---

[6] VIII *Trials of War Criminals Before the Nuernberg Military Tribunals* 1173-74 (1952) (the "Farben Trial") ("Charged with the responsibility of meeting fixed production quotas, Farben yielded to the pressure of the Reich Labor Office and utilized involuntary foreign workers in many of its plants. It is enough to say here that the utilization of forced labor, unless done under such circumstances as to relieve the employer [the Farben company] of responsibility, constitutes a violation of [international law]."); *see also* IX *Trials of War Criminals Before the Nuernberg Military Tribunals* 1375-76 (1950) (the "Krupp Trial") ("[T]hroughout German industry in general, and the firm of Krupp and its subsidiaries in particular, prisoners of war of several nations including French, Belgian, Dutch, Polish, Yugoslav, Russian, and Italian military internees were employed in armament production in violation of the laws and customs of war.").

[7] The majority contend that the failure of the Nuremberg tribunal to impose civil damages on Farben shows that international law does not impose damages on corporations. Maj. Op. 32. This argument demonstrates the illogic and internal inconsistency of the majority's position. The Nuremberg tribunal also did not impose liability for civil damages on Farben's executives whom it convicted criminally. If the fact that Nuremberg did not impose civil liability on the Farben corporation means that international law does not allow for civil liability of corporations, then the fact that Nuremberg did not impose civil liability on Farben's guilty personnel must mean that international law does not allow for civil liability of natural persons. Yet the majority concede that such natural persons are liable for civil damages. The Nuremberg tribunal simply did not contemplate questions of civil liability, nor has any subsequent international tribunal. As I explain below, the law of nations has simply not ventured into determinations with respect to civil liability. It has left that question to individual nations.

12

Nuremberg whether international law countenances the imposition of civil liability on a corporation or on any other type of actor for exploitation of slave labor.

Perhaps more pertinent today is commercial exploitation of sex-slavery. Entrepreneurs in child prostitution kidnap unprotected children in poverty stricken areas and hold them in captivity to satisfy sex cravings of customers. Young women, seeking to escape from places where they are oppressed, incur debts to facilitators, who promise to help them, but, when they are unable to pay the entire fee, consign them into sex-slavery, compelling them to perform acts of prostitution a hundred times a day for the profit of their captors until either the debt is considered paid, or, more likely, the woman is so wasted by the abuse she has suffered that she ceases to be a marketable sex object.[8] According to the majority's rule, an incorporated entity does not violate international law when it conducts such operations, and is free to retain any profit earned through its conduct.

*b) Piracy.* Once thought to have faded into a past remembered only in romanticized children's fables and Gilbert & Sullivan whimsy, piracy now reemerges as a threat to

---

[8] *See* Trafficking Victims Protection Reauthorization Act of 2005, Pub. L. 109-164, § 2, 119 Stat. 3558, 3558 (Jan. 10, 2006) (noting that an estimated 600,000 to 800,000 individuals are trafficked across international borders each year and exploited through forced labor and commercial sex exploitation, of which 80% are women and girls); United Nations Office on Drugs and Crime, Global Report on Trafficking in Persons 48-50 (Feb. 2009), *available at* http://www.unodc.org/documents/Global_Report_on_TIP.pdf (noting approximately 14,900 incidents of human trafficking were reported in 2006, 79% of which involved sexual exploitation).

international trade.[9] In Somalia, pirates seize vessels in the Indian Ocean and exact large ransom payments from the owners and insurers. In the port of Lagos, Nigeria, armed pirates board anchored vessels waiting for access to the harbor and steal their cargo. My colleagues' new rule offers secure protection for the profits of piracy so long as the perpetrators take the precaution to incorporate the business.[10]

The majority opinion goes still further. Because it claims that juridical entities are not "subjects" of international law and have neither rights nor obligations under it, they can neither sue nor be sued for violations of international law. Accordingly, the seizure by pirates of a vessel *owned by a corporation* (as virtually all commercial vessels are) would not violate international law's prohibition of piracy, and the vessel's corporate owner, from which a ransom had been extorted as the price of freeing its ship, would have no remedy under the ATS or any other comparable provision in any other nation.

*c) Genocide.* A number of the cases brought before our courts under the ATS, including this one, are brought against business corporations engaged in extraction of precious resources

---

[9] *See generally* Lauren Ploch et al., Cong. Research Serv., *Piracy Off the Horn of Africa* (Sept. 28, 2009); Peter Chalk, *The Maritime Dimension of International Security: Terrorism, Piracy, and Challenges for the United States* 6 (RAND 2008).

[10] The possibility of pirates operating through the corporate form is not far-fetched. According to a recent United Nations report, Somali pirates essentially operate as limited partnerships, in which investors make investments of money, weaponry, and equipment in exchange for "Class A" and "Class B" participations in the profits of piracy operations. Rep. of the Monitoring Group on Somalia Pursuant to Security Council Resolution 1853 (2008), U.N Doc. No. S/2010/91, at 99 (Mar. 10, 2010). The profits of such an operation can be substantial, as in the case of the MV Faina, which was released in February 2009 for $3.2 million ransom. *See Piracy Off the Horn of Africa*, *supra*, at 10-11.

from mines, wells, or forests in remote, sparsely populated areas. At times, local tribesmen harass and hinder the corporation's operations, resenting the despoliation of their habitat and the failure to share with them the wealth taken from what they see as their land. The corporation solicits the protection of that nation's police or military forces. Most of the suits we have seen, like this one, have accused the defendant corporations of aiding and abetting the local government in the latter's abuse of the rights of those indigenous persons.

Such a company, however, failing to receive adequate protection from the local authorities, might mount its own protective security force and proceed, either independently or working together with forces of the local government, to exterminate the troublemaking tribes. The complaint under ATS in such a case would charge that the corporation *itself* committed genocide in order to protect its business operations from harassment and increase its profits.

Under the majority's rule, such a corporation would never need to test in court whether it in fact exterminated a tribe, as alleged. It could simply move for the dismissal of the suit, asserting that it is a corporation and therefore by definition could not have violated international law's prohibition of genocide. The plaintiffs could bring a successful ATS suit against the hirelings who carried out the genocide for the corporation (in the unlikely event they could be sued in a court that provided for civil liability). But as for the corporation itself, which committed a genocide to increase its profits, the suit will be dismissed on the ground that the defendant is a corporation.

*2) Aiding and abetting*

As just noted, a number of suits, like this one, charge corporations engaged in the

15

extraction of precious resources in remote places with having *aided and abetted* abuses committed by a foreign government's police or military forces against local populations. In all likelihood, corporations like the defendants in this case, when they ask a relatively impecunious local government to render protection to the corporation's operations, will contribute money and resources to the local government to help it render the protection the corporation needs for its operations. If the government troops then commit atrocities, the victims might sue the corporation on the theory that it aided and abetted the government's brutalities by its contribution of money and resources. Similarly, business corporations engaged in finance or in the sale of food or military supplies might raise funds for, or sell supplies to, a government that is known to violate the law of nations. Victims of that government's abuses might sue the corporation, alleging that the corporation's profit-motivated provision of finance or supplies, done with awareness of the purchasing government's record of atrocities, constitutes aiding and abetting of those atrocities.

Many argue with considerable force that imposition of liability in such circumstances would go too far in impeding legitimate business, by making a business corporation responsible for the illegal conduct of local government authorities that is beyond the corporation's control, and which the corporation may even deplore. The shoemaker who makes Hitler's shoes should not be held responsible for Hitler's atrocities, even if the shoemaker knows that a pair of shoes will help Hitler accomplish his horrendous agenda. Concerns of this nature might well give pause to a court contemplating the imposition of liability on a business corporation for aiding and abetting in a government's infliction of human rights abuses, where the corporation did not

16

promote, solicit, or desire the violation of human rights.

At least in this circuit, however, there is no cause for such concern. In *Khulumani v. Barclay National Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007), Judge Katzmann in his concurring opinion expressed the view that international law does not deem it aiding and abetting in violation of that law to act in a manner that assists a violator unless the assistance is given with a purpose to cause or facilitate the violation. *Id.* at 277 (Katzmann, J., concurring). Then, in *Talisman*, we ruled on whether a corporation could be held liable for aiding and abetting under the standards of international law merely because it knew that supplies it furnished to a local government would be used in the commission of human rights abuses. Although confronted with evidence of shocking human rights violations committed by the government of Sudan, we found that there is no such aiding and abetting liability. Following Judge Katzmann's analysis, we concluded that the standards of international law admit of aiding and abetting liability only when the accused aider acts *with a purpose* to bring about the violations of international law. 582 F.3d at 259. In this circuit, supplying financing or military equipment to a local government will not support the imposition of aiding and abetting liability on the corporation for that government's abuses unless the corporation acted *with a purpose* to promote or advance those violations. (For that reason, and as explained in Part VII below, this Complaint must be dismissed for failure to state a proper claim for aiding and abetting liability.)

A true question of tort liability for corporate aiding and abetting in government atrocities would be raised where such a defendant *purposely* procures the commission of genocide by local government forces. Assume the hypothetical oil exploration company first seeks protection from

17

the local host government from interference with its operations by indigenous tribes. For a period of time, the government forces provide ineffectual protection, but harassment, interference, and sabotage by the tribes continue. Eventually, the frustrated corporate managers say to the local police chief or military commander: "We have been slipping you very handsome sums, but you have done nothing for us. These protestors continue to cut our pipelines, and sabotage our machinery. The time has come for you to bring this harassment to an end. Wipe them out! There will be a generous bonus for you when it is done." The local government officials comply. Those are facts that *would* raise an issue of corporate liability for aiding and abetting because the alleged aider and abetter intended, solicited, and deliberately procured the primary actor's violations of international law. The rule my colleagues have adopted, however, holds that the corporation has committed no violation and its profits are protected from liability, notwithstanding that it purposely solicited, procured, and caused the genocide in order to render its operations more profitable.

*     *     *     *     *

Consideration of such examples demonstrates beyond possibility of reasonable disagreement that the rule my colleagues attribute to the law of nations operates to the detriment of the objective of international law to protect fundamental human rights. My colleagues' only response to these examples is that they do not choose to respond to them. Maj. Op. 12. Defenders of the majority opinion might argue that I have chosen extreme and unrepresentative examples to cast the majority's rule in an unreasonably pejorative light. It is true that the hypothetical cases I present for examination involve extraordinarily abhorrent conduct. But the

reason I raise such abhorrent conduct is because the law of nations, at least in its humanitarian branch, concerns itself only with extreme abhorrent conduct – conduct that draws the unanimous opprobrium of the entire civilized world. The Supreme Court made clear in *Sosa* that liability is imposed under the ATS for conduct that is condemned throughout the civilized world and that renders one the "enemy of all mankind." *Sosa*, 542 U.S. at 732. Suits alleging ordinary, less repugnant, less universally condemned torts (including the allegations in *Sosa* itself of a temporary abduction of an alleged criminal to bring him to answer criminal charges) will be dismissed whether brought against a natural person or a corporation because of failure to plead a violation of the law of nations. The effect of the majority's rule is to immunize the profits earned from the most heinous acts known to mankind.

I recognize that pointing out the incompatibility of the majority's rule with the objectives of international law does not conclude the argument. If the supposed rule the majority relies on in fact reflects the law of nations and international law indeed does not apply to corporate conduct (as the majority claim), then we must apply that rule in a case brought under the ATS regardless of whether we find it illogical or incompatible with the objectives of international law. Law is not always logical.

But neither is the observation irrelevant. Recognition of the humanitarian objectives of the law of nations makes it unlikely that this body of law intends to exempt corporations from its prohibitions or to provide a substantial financial incentive to violate the most fundamental of human rights. *Cf. The Amy Warwick*, 67 U.S. (2 Black) 635, 670 (1862) ("The law of nations is . . . founded on the common consent as well as the common sense of the world. It contains no . . .

anomalous doctrine."). The incompatibility of the majority's rule with the objective of the law of nations to protect fundamental human rights warrants skepticism as to whether international law in fact has such a rule. Before reaching a conclusion whether the majority's "rule" has indeed been adopted by the nations of the world as a rule of international law, we would want to examine whether the rule has any purported justification that might explain its adoption in spite of its apparent incompatibility with the principles and objectives of the law of nations.

*B. The absence of any reason, purpose, or objective for which international law might have adopted such a rule.* In asserting that international law exempts corporations from any obligation to comply with its rules, the majority implicitly contend that the nations of the world have some kind of reason, or some shared objective, that might justify the rule. The question then arises what objective the rule would serve. Where a corporation earns profits by exploiting slave labor, or by causing or soliciting a genocide in order to reduce its operating costs, what objective would the nations of the world seek by a rule that subjects the foot soldiers of the enterprise to compensatory liability to the victims but holds that the corporation has committed no offense and is free to retain its profits, shielded from the claims of those it has abused?

Where the legal systems of the world encourage the establishment of juridical entities, endowing them with legal status by giving them authorization to own property, make contracts, employ labor, and bring suits, treating them as exempt from the law's commands and immune from suit would serve no rational purpose. In fact, nowhere are they so immunized. *E.g.*, Doug Cassel, *Corporate Aiding and Abetting of Human Rights Violations: Confusion in the Courts*, 6 Nw. J. Int'l Human Rights 304, 322 (2008) ("I am not aware of any legal system in which

20

corporations cannot be sued for damages when they commit legal wrongs that would be actionable if committed by an individual.").

My colleagues do not even suggest any purpose or goal the nations of the world might hope to derive from such a rule, and I can think of none. Before accepting my colleagues' suggestion that a rule so incompatible with the objectives of international law and so lacking in logical justification is in fact a rule of international law, we should demand at least a reasonably persuasive showing based on the precedents of international law. The majority, however, have no such precedents to offer.

**II.     The absence of precedent for the majority's rule**

No authoritative source document of international law adopts or in any way approves the majority's view that international law authorizes imposing civil awards of compensatory damages on natural persons but leaves corporations free to violate its rules without legal consequences.[11]

---

[11] The majority's characterization of the *facts* upon which their theory rests is occasionally subject to dispute. For example, the opinion asserts that "customary international law has steadfastly rejected the notion of corporate liability for international crimes." Maj. Op. 9. The opinion refers to "a jurisprudence, first set forth in Nuremberg and repeated by every international tribunal of which we are aware, that offenses against the law of nations . . . can be enforced against States and individual men and women but not against juridical persons such as corporations." *Id.* It maintains, "there are ample sources of international law explicitly *rejecting* corporate liability." Maj. Op. 10 n.21. However, the most that can be asserted as fact, as opposed to argument, is that international tribunals have not been empowered to exercise criminal jurisdiction over corporations or civil jurisdiction over any sort of private actor.

The majority opinion further asserts that "no international tribunal has ever held a corporation liable for a violation of the law of nations," Maj. Op. 9, and that "no corporation has ever been subject to *any* form of liability under the customary international law of human rights," Maj. Op. 10. The fact is, however, that no international tribunal has ever considered whether a corporation or a natural person can be held civilly liable in damages for violation of the customary law of nations, because no international tribunal has ever exercised civil

*A. No court decisions or other legal precedents espouse the majority's rule.* No court has ever dismissed a civil suit against a corporation, which alleged a violation of the laws of nations, on the ground that juridical entities have no legal responsibility or liability under that law. No court has ever discussed such a rule with even vaguely implied approval. Quite to the contrary, on many occasions courts have ruled in cases involving corporate defendants in a manner that assumed without discussion that corporations could be held liable.[12] To my knowledge there is

jurisdiction over private actors.

The majority describe their ruling as answering a "question that has been lurking for some time in our ATS jurisprudence." Maj. Op. 15. It is not the case, however, that judges have struggled uncomfortably with this problem for decades. While the ATS has been in our law for over 200 years and was held to apply in actions both by and against corporations as early as 1795, 1 Op. Att'y Gen. 57, 59 (1795), and 1907, 26 Op. Att'y Gen. 250, 253 (1907), it was only four years ago that corporate immunity was first argued to our court and only eight years ago that it was first argued to a district court. *See Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 282 (2d Cir. 2007); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 319 (S.D.N.Y. 2003).

[12] *See, e.g.*, *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009) (holding that allegation that a *corporate* defendant engaged in non-consensual medical experimentation on human subjects stated a claim under the ATS for violations of law of nations), *cert. denied*, 78 U.S.L.W. 3049; *Sarei v. Rio Tinto, PLC*, 487 F.3d 1193 (9th Cir. 2007) (concluding that nonfrivolous claims against international mining corporation for vicarious liability for violations of *jus cogens* norms were sufficient to warrant exercise of federal jurisdiction under the ATS), *vacated in part on other grounds*, 550 F.3d 822 (9th Cir. 2008) (en banc); *Doe I v. Unocal Corp.*, 395 F.3d 932 (9th Cir. 2002) (concluding that a private party – such as Unocal, a corporation – may be subject to suit under the ATS for aiding and abetting violations of customary international law and for violations of certain *jus cogens* norms without any showing of state action), *reh'g en banc granted*, 395 F.3d 978 (9th Cir. 2003), *appeal dismissed,* 403 F.3d 708 (9th Cir. 2005); *Aguinda v. Texaco, Inc.*, 303 F.3d 470 (2d Cir. 2002) (dismissing ATS case against corporate defendant on forum non conveniens grounds, because courts of Ecuador provided adequate alternative forum); *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000) (reversing district court's dismissal of ATS complaint against corporations on forum non conveniens grounds, and affirming district court's ruling that corporations were subject to personal jurisdiction in New York); *Jota v. Texaco*, Inc., 157 F.3d 153 (2d Cir. 1998) (vacating district court's dismissal of

only one opinion by a judge which has spoken favorably of such a principle, and that was a single judge's dissenting opinion. *See Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 292 (2d Cir. 2007) (Korman, J., concurring in part and dissenting in part).[13] Since that dissenting judge aired his view, numerous corporations have moved for the dismissal of their cases on the ground that juridical entities are exempted from civil liability by the law of nations. Every court that has passed on the question has rejected the contention.[14]

---

ATS case against corporation on forum non conveniens grounds and remanding for further proceedings); *Bowoto v. Chevron Corp.*, 557 F. Supp. 2d 1080 (N.D. Cal. 2008) (denying oil company defendants' motion for summary judgment on claims that U.S. corporation, acting through its Nigerian subsidiary, aided and abetted violations of laws of nations; case proceeded to trial before jury, which found in favor of defendants); *Licea v. Curacao Drydock Co.*, 584 F. Supp. 2d 1355 (S.D. Fla. 2008) ($80 million ATS judgment against defendant corporation for human trafficking and forced labor); *Chowdhury v. WorldTel Bangladesh Holding*, Ltd., No. 08 Civ. 1659 (BMC) (E.D.N.Y. Aug. 6, 2009), ECF No. 48 ($1.5 million ATS jury verdict entered against defendant holding company for torture), *appeal filed*, No. 09-4483-cv (2d Cir.); *see also Hilao v. Estate of Marcos*, 103 F.3d 767, 776-77 (9th Cir. 1996) (affirming $2 billion ATS class award against *estate* of former president of Philippines for gross human rights violations committed during his reign). (The majority's rule would immunize an estate or trust equally with a corporation, as it applies to all juridical entities.)

[13] Judge Katzmann wrote in response, "This argument [that corporations may not be held liable under the ATS] was not raised by the defendants on appeal and therefore the issue was not briefed by the parties. It is perhaps not surprising that neither the defendants nor the United States raised this issue as a bar to liability: We have repeatedly treated the issue of whether corporations may be held liable under the AT[S] as indistinguishable from the question of whether private individuals may be." *Khulumani*, 504 F.3d at 282 (Katzmann, J., concurring).

[14] *Sinaltrainal v. Coca-Cola* Co., 578 F.3d 1252, 1263 (11th Cir. 2009) ("In addition to private individual liability, we have also recognized corporate defendants are subject to liability under the ATS and may be liable for violations of the law of nations." (citing *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1315 (11th Cir. 2008) ("The text of the Alien Tort Statute provides no express exception for corporations, and the the law of this Circuit is that [ATS] grants jurisdiction from complaints of torture against corporate defendants.")); *Al-Quraishi v. Nakhla*, No. Civ. No. 08-1696, 2010 WL 3001986, at *39 (D. Md. July 29, 2010) ("There is no

The majority's view that corporations have neither rights nor obligations under international law is further refuted by two venerable opinions of the Attorney General of the United States. In 1907, the Attorney General rendered an opinion that an American corporation could be held liable under the ATS to Mexican nationals if the defendant's "diversion of the water [of the Rio Grande] was an injury to substantial rights of citizens of Mexico under the principles of international law or by treaty." 26 Op. Att'y Gen. 252, 253 (1907). And in 1795, shortly after the enactment of the ATS, the Attorney General opined that a British corporation could pursue a civil action under the ATS for injury caused to it in violation of international law by American citizens who, in concert with a French fleet, had attacked a settlement managed by

basis for differentiating between private individuals and corporations [under the ATS] . . . ."); *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 229, 254-55 (S.D.N.Y. 2009) (Scheindlin, J.) (rejecting argument that corporate liability cannot be imposed under the ATS); *In re XE Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 588 (E.D. Va. 2009) ("Nothing in the ATS or *Sosa* may plausibly be read to distinguish between private individuals and corporations; indeed, *Sosa* simply refers to both individuals and entities as 'private actors.' . . . [T]here is no identifiable principle of civil liability which would distinguish between individual and corporate defendants in these circumstances." (internal citations omitted)); *see also In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d 7, 58 (E.D.N.Y. 2005) (Weinstein, J.) ("A corporation is not immune from civil legal action based on international law."); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F. Supp. 2d 331, 335 (S.D.N.Y. 2005) (Cote, J.) ("Talisman's argument that corporate liability under international law is not . . . sufficiently accepted in international law to support an ATS claim is misguided."); *Talisman*, 244 F. Supp. 2d 289, 319 (S.D.N.Y. 2003) (Schwartz, J.) ("A private corporation is a juridical person and has no *per se* immunity under U.S. domestic or international law. . . . [W]here plaintiffs allege *jus cogens* violations, corporate liability may follow."); *cf. In re S. African Apartheid Litig.*, No. 02 MDL 1499(SAS), 2009 WL 5177981, at *2 (S.D.N.Y. Dec. 31, 2009) (denying motion for certification of interlocutory appeal, because there are not "substantial grounds for disagreement on the issue of whether ATS extends liability to corporations"); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 01 Civ. 9882 (DLC), 2005 WL 2082847, at *3-*4 (S.D.N.Y. Aug. 30, 2005) (same); *but see* discussion of *Doe v. Nestle*, at footnote * on page 3, *supra*.

24

the corporation in Sierra Leone in violation of international law. *See* 1 Op. Att'y Gen. 57 (1795).

Attorney General William Bradford explained:

> there can be no doubt that the company or individuals who have been injured by these acts of hostility have a remedy by a *civil* suit in the courts of the United States; jurisdiction being expressly given to these courts in all cases where an alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States . . . .

*Id.* at 59. *Cf. Sosa*, 542 U.S. at 721 ("Bradford . . . made it clear that a federal court was open for the prosecution of a tort action growing out of the episode.").[15]

In sum, the principle that my colleagues contend forms a part of the law established by the universal consensus of the nations of the world – that juridical persons have neither rights nor obligations – has never been addressed with favor in any opinion on behalf of any court and has many times been rejected.

*B. No international tribunal is structured with a jurisdiction consistent with the majority's rule.* If there were international tribunals established with jurisdiction to award civil damages against natural persons but not against juridical entities, this would give significant support to the majority's contention that the conventions of international law attach importance to whether a person against whom compensatory liability is sought is a natural person or a juridical entity. But there is no international tribunal established with such jurisdictional restrictions.

---

[15] Although the Supreme Court relied on Attorney General Bradford's 1795 in *Sosa*, the majority's only response to these Attorney General opinions is that they "do[ no]thing more than baldly declare" conclusions which the majority consider erroneous. Maj. Op. 41 n.44. (They add the irrelevancy that one of the opinions would require dismissal of this suit on a completely different ground.)

The international tribunals that have been established to date with jurisdiction over private persons have concerned themselves only with criminal punishment.[16] None has ever had jurisdiction to consider a private civil remedy of any kind – either against a natural person or a juridical entity. No international tribunal furnishes a precedent for the majority's rule. (I discuss below, in Part III, the fallacy of the majority's argument that the restriction of criminal punishments for violations of the law of nations to natural persons reflects an intention in international law to immunize juridical entities from civil compensatory liability.)

*C. Quoting out of context from a footnote in the Supreme Court's* <u>Sosa</u> *opinion, the majority attribute to it a meaning opposite to what it intends.* Quoting a snippet of dictum taken out of context from a footnote in the Supreme Court's *Sosa* opinion, the majority opinion incorrectly attributes to the Court support for the majority's contention that international law distinguishes between natural persons (who can be civilly liable) and corporations (who cannot).

---

[16] The majority find it "particularly significant" that no international (criminal) tribunal has ever held "a corporation liable for a violation of the law of nations." Maj. Op. 28. This misunderstands the role of such tribunals in the *enforcement* of the law of the nations. The primary, and prior to the twentieth century, the exclusive, means of applying and enforcing the requirements of customary international law was the *domestic* law of civilized nations. The very actions that were "uppermost" in the First Congress's mind in passing the ATS – piracy, violations of safe conduct, and offenses against ambassadors – had been punished not by an international tribunal but by the domestic courts of England under the domestic law of England. *See Sosa*, 542 U.S. at 715, 719; 4 William Blackstone, Commentaries *66. Only beginning in World War I, with the advent of the Permanent Court of International Justice, did international law also provide an international court for enforcing these requirements. And, until the establishment of the International Criminal Court, it provided courts to enforce international law against individuals only on an ad hoc basis, convening to carry out judgment for particular violations of international law – for example, in Nazi Germany, the former Yugoslavia, and Rwanda. Such tribunals have exercised only criminal jurisdiction. They have never entertained claims of civil liability directed against either corporations or natural persons.

To the extent the *Sosa* opinion says anything on the subject, it communicates the opposite of what the majority attribute to it.

The majority assert that in footnote 20 of Justice Souter's opinion, the Supreme Court instructed the lower courts to consider in ruling in ATS claims "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or an individual." Maj. Op. 18, 22. According to the majority opinion, the quoted fragment means that when the defendant is a private actor, such as a natural person or a corporation, a determinative question will be whether well established norms of international law impose liability on such a perpetrator – and the answer may be different depending on whether the actor is a natural person or a corporation. If read in context, however, the passage means the contrary.

The *Sosa* suit was brought by Alvarez-Machain, a Mexican doctor believed by U.S. government authorities to have participated in the torture and murder by a Mexican drug cartel of an agent of the U.S. Drug Enforcement Administration. The allegation under the ATS asserted that the defendant Sosa, acting on behalf of the U.S. government, had helped to seize Alvarez in Mexico and bring him to the United States to stand trial for his role in the murder. Alvarez was eventually acquitted of the crime. He contended that his abduction violated the law of nations and thus presented a basis for tort liability under the ATS.

The Justices of the Supreme Court all agreed that Alvarez's claims under the ATS should be dismissed because the illegal conduct he asserted did not violate the law of nations. What divided the Justices was whether damages may *ever* be awarded in a suit under the ATS. The

minority, taking essentially the position asserted by Judge Bork in *Tel-Oren*, argued that in the absence of further legislation supplying a cause of action, a U.S. court had no basis to award damages because the ATS did no more than confer jurisdiction, and no statute furnished a cause of action. *See Sosa*, 542 U.S. at 750 (Scalia, J., concurring in the judgment).

The majority of the Court rejected the minority view that the ATS can have no practical application unless and until some future Congress passes additional statutes making the law of nations enforceable in a U.S. court. Citing the 1795 opinion of Attorney General Bradford, 1 Op. Att'y Gen. 57, and reaffirming that "the domestic law of the United States recognizes the law of nations," 542 U.S. at 729-30, Justice Souter's opinion construed the intent of the First Congress in passing the ATS as "furnish[ing] jurisdiction for a relatively modest set of actions" by private actors, which implicated the interests of States. *See id.* at 715, 720. The Court majority noted that the ATS originally was meant to authorize litigation of a "narrow set of common law actions derived from the law of nations," *id.* at 721, but that in the present day, federal courts retained authority to decide claims arising under new "international norm[s] intended to protect individuals," *id.* at 730. Recognizing, however, "good reasons for a restrained conception of the discretion federal courts should exercise in considering a new cause of action of this kind," the Court cautioned that a claim based on the "present-day law of nations [should] rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms." *Id.* at 725.

Justice Souter then turned parenthetically to a concern brought into focus by the D.C.

Circuit's decision in *Tel-Oren* and this court's decision in *Kadic*.[17] Judge Edwards in *Tel-Oren* and this circuit in *Kadic* had each contemplated that certain forms of conduct were violations of international law, as opposed to violations of local law, only when done by a State (or under color of a State's law) and not when done by a private actor acting independently of a State. (This resulted from international law's primary focus on the concerns and conduct of States.) Judge Edwards concluded that, while torture practiced by a State violated the law of nations, there was no wide consensus that torture, *if done independently by a private actor*, constituted a violation of the law of nations. *Tel-Oren*, 726 F.2d at 794-95 (Edwards, J., concurring). *Kadic* reflected on the same question with respect to genocide and concluded that genocide was generally accepted as violating the laws of nations regardless of whether done by a State or by a private actor. *Kadic*, 70 F.3d at 241-42. Nothing in the *Tel-Oren* or *Kadic* opinions suggests in any way that the law of nations might distinguish between conduct of a natural person and of a corporation. They distinguish only between private and State action. The *Sosa* footnote refers to the concern of *Tel-Oren* and *Kadic* – that some forms of noxious conduct are violations of the law of nations when done by or on behalf of a State, but not when done by a private actor independently of a State, while other noxious conduct violates the law of nations regardless of whether done by a

---

[17] The European Commission also raised this concern as amicus curiae. *See* Br. of Amicus Curiae the European Comm'n in Supp. of Neither Party, at 10, *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) (No. 03-339) ("[O]nly a subset of norms recognized as customary international law applies to non-state actors, such as corporations, and hence only that subset may form the basis of liability against such actors. For example, non-state actors may be liable for genocide, war crimes, and piracy, while torture, summary execution, and prolonged arbitrary detention do not violate the law of nations unless they are committed by state officials or under color of law." (citing, inter alia, *Tel-Oren* or *Kadic*)), *available at* 2004 WL 177036.

29

State or a private actor. Expressly referring to these discussions in *Tel-Oren* and *Kadic*, *Sosa*'s footnote 20 notes the pertinence of the consideration "whether international law extends the scope of liability for a violation of a given norm for the perpetrator being sued, *if the defendant is a private actor such as a corporation or an individual*" (emphasis added). *See also Sosa*, 542 U.S. at 760 (Breyer, J. concurring) ("The norm must extend liability to the type of perpetrator (e.g., a private actor) the plaintiff seeks to sue.").

Far from implying that natural persons and corporations are treated *differently* for purposes of civil liability under ATS, the intended inference of the footnote is that they are treated *identically*. If the violated norm is one that international law applies only against States, then "*a private actor, such as a corporation or an individual*," who acts independently of a State, can have no liability for violation of the law of nations because there has been no violation of the law of nations. On the other hand, if the conduct is of the type classified as a violation of the norms of international law regardless of whether done by a State or a private actor, then "*a private actor, such as a corporation or an individual*," has violated the law of nations and is subject to liability in a suit under the ATS. The majority's partial quotation out of context, interpreting the Supreme Court as distinguishing between individuals and corporations, misunderstands the meaning of the passage.

**III.    The deficiencies of the majority's reasoning**

In view of the complete absence of precedential support for their rule, the majority's position rests solely on arguments. These arguments rest on illogical propositions and misunderstandings of law and precedent.

*A. The refusal to empower international <u>criminal</u> tribunals to impose <u>criminal</u> punishment on corporations (for reasons which depend solely on the suitability of criminal punishment to corporations) in no way implies that international law exempts corporations from its rules.* The only fact of international law to which the majority can point as evidence of its view that international law does not apply to juridical persons is the fact that international *criminal* tribunals have not exercised authority to impose *criminal* punishments on them. According to the majority, it follows inescapably that juridical entities are not subject to international law. The argument is simply a non sequitur.[18]

The majority are absolutely correct that international criminal tribunals have consistently been established without jurisdiction to impose criminal punishments on corporations. At the start of modern prosecution by international tribunals for violations of the law of nations, the military tribunals at Nuremberg, established under the London Charter and Control Council Law No. 10 to punish those responsible for the Nazi atrocities, found that the Farben corporation

---

[18] The majority opinion argues at one point that "customary international law does not develop through 'logical' expansion of existing norms," and that its rules cannot be extended by "parity of reasoning." Maj Op. 36-37 & n.37. In spite of this assertion, the majority opinion seeks by "parity of reasoning" to extend international law's refusal to exercise criminal jurisdiction over corporations into a principle of refusal to allow imposition of civil liability on corporations. The problem with the exercise is not only the majority's inconsistency on the inappropriateness of logical extension by parity of reasoning, but more importantly that its asserted extension is based on neither logic nor parity of reasoning. Parity of reasoning undertakes to apply the same rule to logically indistinguishable cases. The majority seek by illogical argument to extend a rule justified solely by one set of circumstances into other situations that lack the justifying circumstances. Legal scholarship often extols the virtue of deciding like cases in like fashion. The majority here undertake to decide unlike cases in like fashion.

violated the standards of the law of nations and therefore imposed punishment on the responsible Farben personnel, but did not prosecute the corporation. The subsequent international *criminal* tribunals have also been established with jurisdiction over only natural persons. In the recent establishment of the International Criminal Court (ICC) under the Rome Statute, July 17, 1998, 37 I.L.M. 999, 2187 U.N.T.S. 90, a proposal advanced by France to extend the court's jurisdiction to include the prosecution of corporations and other juridical persons was defeated. On this basis the majority declare it "abundantly clear," Maj. Op. 35 (although furnishing no explanation for this abundant clarity), that the prohibitions of international law do not apply to corporations.

The reasons why the jurisdiction of international criminal tribunals has been limited to the prosecution of natural persons, as opposed to juridical entities, relate to the nature and purposes of *criminal* punishment, and have no application to the very different nature and purposes of civil compensatory liability. According to views widely shared in the world, an indispensable element to the justification of criminal punishment is criminal intent.[19] Many courts and writers have taken the position that, because criminal intent cannot exist in an artificial entity that exists solely as a juridical construct and can form no intent of any kind, it is an anomaly to view a corporation

---

[19] *See, e.g.*, 2 Int'l Commission of Jurists, *Corporate Complicity & Legal Accountability* 57-58 (2008) ("National criminal laws were developed many centuries ago, and they are built and framed upon the notion of the individual human being as a conscious being exercising freedom of choice, thought and action. Businesses as legal entities have been viewed as fictitious beings, with no physical presence and no individual consciousness."); L.H. Leigh, *The Criminal Liability of Corporations and Other Groups: A Comparative View*, 80 Mich. L. Rev. 1508, 1509 (1982) ("These arguments [against corporate criminal liability] may be summarized quickly: a corporation has no mind of its own and therefore cannot entertain guilt; it has not body and therefore cannot act *in propia persona*; . . . .").

as criminal.[20] In addition, *criminal* punishment does not achieve its principal objectives when it is imposed on an abstract entity that exists only as a legal construct. Criminal punishment seeks to impose meaningful *punishment* – in other words, to inflict, for salutary effect, a measure of *suffering* on persons who have violated society's rules. 1 Charles E. Torcia, *Wharton's Criminal Law* § 1, at 2 (15th ed. 1993) ("The 'criminal' law attempts to force obedience—or to discourage disobedience—by punishing offenders."). The infliction of punitive suffering has several objectives. One is to give society the satisfaction of retribution – of seeing that one who has broken its rules and has caused suffering is required in turn to endure suffering. Another is to disable the offender from further criminal conduct during imprisonment. A third is the hope that the infliction of punitive suffering will change the criminal's conduct, bringing about either his repentance or, at least, his realization that further criminal conduct is likely to result in still more severe punishment. Yet another objective is to dissuade others similarly situated from criminal

---

[20] *See, e.g.*, 2 Int'l Commission of Jurists, *supra* note 19, at 58 ("[M]any perceive it to be impossible to prove that a business entity had criminal intent, or knowledge."); V.S. Khanna, *Corporate Criminal Liability: What Purpose Does It Serve?*, 109 Harv. L. Rev. 1477, 1490 (1996) ("Many European jurisdictions initially refused to recognize corporate criminal liability because the notion that a juristic fiction such as a corporation could possess guilt in the sense necessary for the application of the criminal law seemed far-fetched."); Guy Stessens, *Corporate Criminal Liability: A Comparative Perspective*, 43 Int'l & Comp. L.Q. 493, 496 (1994) (describing decisions of the Queen's Bench that "managed to surmount the so-called '*mes rea* hurdle'"); Gerhard O.W. Mueller, *Mens Rea and the Corporation*, 19 U. Pitt. L. Rev. 21, 29 (1957) (discussing mid-century French view that "corporate criminal liability is irreconcilable with the guilt principle"); Robert Phillimore, *Commentaries upon International Law* 50 (1854) ("Criminal law is concerned with a *natural* person; a being of thought, feeling, and will. A *legal* person is not, strictly speaking, a being of these attributes, though, through the medium of representation and of government, the will of certain individuals is considered the will of the corporation; but only for certain purposes.").

conduct through the implicit warning that, if they yield to the temptations of illegal conduct,

suffering may be inflicted on them.[21]

When criminal punishment is inflicted on an abstract entity that exists only as a legal construct, none of these objectives is accomplished. A corporation, having no body, no soul, and no conscience, is incapable of suffering, of remorse, or of pragmatic reassessment of its future behavior. Nor can it be incapacitated by imprisonment. The only form of punishment readily imposed on a corporation is a fine, and this form of punishment, because its burden falls on the corporation's owners or creditors (or even possibly its customers if it can succeed in passing on its costs in increased prices), may well fail to hurt the persons who were responsible for the corporation's misdeeds. Furthermore, when the time comes to impose punishment for past misdeeds, the corporation's owners, directors, and employees may be completely different

---

[21] *See, e.g.*, Prosecutor v. Kayishema & Ruzindana, Case No. ICTR-95-1-T, Sentence, ¶ 2 (June 1, 2001) ("This Chamber must impose sentences on convicted persons for retribution, deterrence, rehabilitation, and to protect society. As to deterrence, this Chamber seeks to dissuade for good those who will be tempted in the future to perpetrate such atrocities by showing them that the international community is no longer willing to tolerate serious violations of international humanitarian law and human rights."); Prosecutor v. Nahimana, Case No. ICTR-99-52-T, Judgement and Sentence, ¶ 1095 (Dec. 3, 2003) ("The Chamber considers that sentencing serves the goals of retribution, deterrence, rehabilitation, and protection of society."); Prosecutor v. Musema, Case No. ICTR-96-13, Judgment and Sentence, ¶ 986 (Jan. 27, 2000) ("The penalties imposed by this Tribunal must be directed at retribution, so that the convicted perpetrators see their crimes punished, and, over and above that, at deterrence, to dissuade for ever others who may be tempted to commit atrocities by showing them that the international community does not tolerate serious violations of international humanitarian law and human rights."); Prosecutor v. Kupreskic, Case No. IT-95-16-T, Judgment, ¶ 848 (Jan. 14, 2000) ("[I]n general, retribution and deterrence are the main purposes to be considered when imposing sentences in cases before the International Tribunal."); Prosecutor v. Naletilic, Case No. IT-98-34-T, Judgement, ¶ 739 (Mar. 31, 2003) (same).

persons from those who held the positions at the time of the misconduct. What is more, criminal prosecution of the corporation can *undermine* the objectives of criminal law by misdirecting prosecution away from those deserving of punishment. Because the imposition of criminal punishment on corporations and other juridical entities fails to fulfill the objectives of criminal punishment, the International Military Tribunal at Nuremberg declared, "[O]nly by punishing individuals who commit such crimes [and not by punishing abstract entities] can the provisions of international law be enforced." *The Nurnberg Trial*, 6 F.R.D. 69, 110 (1946); *see* Maj. Op. 7-8. For these reasons, criminal prosecution of corporations is unknown in many nations of the world and is not practiced in international criminal tribunals. *See supra* notes 19-20.

The very sources the majority cite make clear that the reason for withholding criminal jurisdiction over corporations from international tribunals relates to a perceived inappropriateness of imposing *criminal* punishments on corporations. M. Cherif Bassiouni's report on the drafting of the Rome Statute notes the "deep divergence of views as to the advisability of including *criminal responsibility* of legal [i.e., juridical] persons" in the Rome Statute. Maj. Op. 34 (quoting *Draft Report of the Intersessional Meeting from 19 to 30 January 1998 [Held] in Zuthphen, The Netherlands*, in *The Statute of the International Criminal Court: A Documentary History* 221, 245 n.79 (M. Cherif Bassiouni ed., 1998)). Andrew Clapham's report notes "the whole notion of corporate *criminal responsibility* [is] simply 'alien'" to many legal systems. Maj. Op. 34 (quoting Andrew Clapham, *The Question of Jurisdiction Under International Criminal Law Over Legal Persons: Lessons from the Rome Conference on an International Criminal Court*, in *Liability of Multinational Corporations Under International*

*Law* 139, 157 (Menno T. Kamminga & Saman Zia-Zarifi eds., 2000)).

The refusal of international organizations to impose criminal liability of corporations – for reasons having to do solely with a corporation's perceived inability to act with a criminal intent and the inefficacy of criminal punishment to achieve its goals when applied to a corporation – in no way implies that international law deems corporations exempt from international law. As the Chairman of the Rome Statute's Drafting Committee has explained, despite the diversity of views concerning corporate *criminal* liability, "all positions now accept in some form or another the principle that a legal entity, private or public, can, through its policies or actions, transgress a norm for which the law, whether national or international, provides, at the very least damages." M. Cherif Bassiouni, *Crimes Against Humanity in International Criminal Law* 379 (2d rev. ed. 1999); *see also* 3 Int'l Commission of Jurists, *Corporate Complicity & Legal Accountability: Civil Remedies* 5 (2006) ("[W]hen the legal accountability of a company entity is sought, the law of civil remedies may often provide victims with their only legal avenue to remedy. This is because *the law of civil remedies will always have the ability to deal with the conduct of companies, individuals and state authorities.*" (emphasis added and footnotes omitted)).

The purposes of civil tort liability are very different from the purposes of criminal punishment. A principal objective of civil tort liability is to compensate victims of illegal conduct for the harms inflicted on them and to restore to them what is rightfully theirs.[22] If a

---

[22] André Tunc, Introduction, in 11 *International Encyclopedia of Comparative Law* ¶ 167, at 96 (André Tunc ed., 1983) ("[T]he law of tort should serve the fulfillment of justice, at least if a compensatory justice, not a punishing one, is contemplated."); Doug Cassel, *Corporate Aiding and Abetting of Human Rights Violations: Confusion in the Courts,* 6 Nw. J. Int'l Human

corporation harms victims by conduct that violates the law of nations, imposition of civil liability on the corporation perfectly serves the objectives of civil liability. It compensates the victims for the harms wrongly inflicted on them and restores to them what is rightfully theirs. What is more, in all likelihood, the objectives of civil tort liability cannot be achieved unless liability is imposed *on the corporation*. Because the corporation, and not its personnel, earned the principal profit from the violation of the rights of others, the goal of compensation of the victims likely cannot be achieved if they have remedies only against the persons who acted on the corporation's behalf – even in the unlikely event that the victims could sue those persons in a court which grants civil remedies for violations of international law. Furthermore, unlike the case with corporate criminal liability, which does not exist in many nations of the world, it is the worldwide practice to impose civil liability on corporations.[23]

---

Rights 304, 322-23 (2008) ("[C]ustomary international law has long held that injuries caused by violations of international norms require reparation, including monetary compensation when full restitution is not possible."); *see also infra* note 24 (quoting decisions of the International Court of Justice and Permanent Court of International Justice to the same effect).

[23] Several international conventions explicitly recognize the diversity in nations' domestic laws regarding the imposition of criminal sanctions on legal or juridical persons. These conventions require State parties to impose criminal sanctions on legal persons, or where that is not possible under the individual nation's domestic law, non-criminal sanctions. *See* Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution and Child Pornography, May 25, 2000, G.A. Res. 54/263, Annex II, 54 U.N. GAOR Supp. (No. 49) at 6, U.N. Doc. A/54/49, Vol. III (2000), *entered into force* Jan. 18, 2002 ("Subject to the provisions of its national law, each State Party shall take measures . . . to establish the liability of legal persons. Subject to the legal principles of the State Party, such liability of legal persons may be criminal, civil or administrative."); Organization for Economic Cooperation and Development, Convention on Combating Bribery of Foreign Public Officials in International Business transactions, art. 3, Nov. 21, 1997, DAFFE/IME/BR(97)20, *entered into force* Feb. 15, 1999 ("The bribery of a foreign public official shall be punishable by effective,

Thus, the reasons that explain the refusal to endow international criminal tribunals with jurisdiction to impose criminal punishments on corporations suggest if anything the opposite as to civil tort liability. Whereas criminal liability of corporations is unknown in much of the world, civil liability of corporations is enforced throughout the world. Whereas the imposition of criminal punishment on corporations fails to achieve the objective of criminal punishment, the compensatory purposes of civil liability are perfectly served when it is imposed on corporations. Whereas criminal prosecution of a corporation could misdirect prosecutorial attention away from the responsible persons who deserve punishment, imposition of civil compensatory liability on corporations makes possible the achievement of the goal of civil law to compensate victims for the abuses they have suffered. There is simply no logic to the majority's assumption that the withholding from international *criminal* tribunals of jurisdiction to impose *criminal* punishments on corporations (for reasons relating solely to a perception that corporations cannot commit crimes) means that international law's prohibitions of inhumane conduct do not apply to corporations.

*B. The majority incorrectly assert that international law does not distinguish between criminal and civil liability; in fact, international law does distinguish between the two, and leaves issues of private civil liability to individual States.* In an effort to defend their illogical leap from the fact that international tribunals have not exercised criminal jurisdiction over juridical persons

---

proportionate and dissuasive criminal penalties. . . . In the event that under the legal system of a Party, criminal responsibility is not applicable to legal persons, that Party shall ensure that legal persons shall be subject to effective, proportional and dissuasive non-criminal sanctions.").

to the conclusion that juridical entities cannot violate international law and thus cannot be sued under the ATS, the majority posit that there is no distinction in international law between civil and criminal liability. Maj. Op. 46. The majority cite neither scholarly discussion nor any source document of international law in support of this assertion. In fact, scholarly writings and source documents of international law contradict their assertion. These sources distinguish in many important respects between criminal and civil liability, and demonstrate that imposition of civil liability for violations of international law falls within the general discretion that individual States possess to meet their international obligations.

In every instance of the establishment of an international tribunal with jurisdiction over private actors, the tribunal has been given exclusively criminal jurisdiction.[24] For instance, the

---

[24] One international tribunal, the closest thing to a tribunal vested with civil jurisdiction – the International Court of Justice (ICJ), which resolves matters referred to it by treaty or agreement of State parties – does award civil reparations against States, which are juridical entities. Statute of the International Court of Justice, art. 36(1), June 26, 1945, 59 Stat. 1055, 33 U.N.T.S. 993. While that court does not exercise jurisdiction over private actors, *id.* art. 34(1), its precedents involving awards of reparations paid by one State to another demonstrate that an award of damages against a juridical entity is familiar ground in international law. In a line of decisions dating to the 1920s, the ICJ and its predecessor court, the Permanent Court of International Justice, have recognized as "a principle of international law that the breach of an international engagement [a duty imposed by international law] involves an obligation to make reparation in an adequate form." Factory at Chorzów (Jurisdiction) (Germany v. Poland), 1927 P.C.I.J. (ser. A) No. 9, at 3, 21 (July 26); *see also* United States Diplomatic and Consular Staff in Tehran (Judgment) (United States of America v. Iran), 1980 I.C.J. 3, 41-42 (May 24) ("Iran, by committing successive and continuing breaches of [treaty obligations] *and the applicable rules of general international law*, has incurred responsibility towards the United States. [I]t clearly entails an obligation on the part of the Iranian State to make reparation for the injury thereby caused to the United States." (emphasis added)); Corfu Channel Case (Merits), 1949 I.C.J. 4, 23 (April 9) ("The Court therefore reaches the conclusion that Albania is responsible under international law for the explosions which occurred on October 22nd, 1946, in Albanian waters, and for the damage and loss of human life which resulted from them, and that there is a duty

39

London Charter established the International Military Tribunal at Nuremberg "for the just and prompt *trial and punishment* of the major war criminals of the European Axis." Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis (the "London Charter"), § I, art. 1, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279.  Control Council Law No. 10 established the U.S. Military Tribunal for the "prosecution" and "punishment" of "war criminals and other similar offenders." Control Council Law 10, preamble, *reprinted in* I *Trials of War Criminals Before the Nuernberg Military Tribunals under Control Council Law No. 10*, at xvi (1950).  The International Criminal Tribunal for the Former Yugoslavia and the International Criminal Tribunal for Rwanda were established to prosecute and punish war criminals.[25]  The parties to the Rome Statute of the International Criminal Court "[a]ffirm that the most serious crimes of concern to the international community as a whole must not go unpunished."  Rome Statute, preamble, ¶ 4.

---

upon Albania to pay compensation to the United Kingdom."); 1 *Oppenheim's International Law* ¶ 155, at 528 n.3  (Sir Robert Jennings & Sir Arthur Watts eds., 9th ed. 1996) (noting an "'international engagement' includes any duty under international law").

[25] *See* Prosecutor v. Kayishema & Ruzindana, Case No. ICTR-95-1-T, Sentence, ¶ 1 (May 21, 1999) (stating that the International Criminal Tribunal for Rwanda was established "to ensure the effective redress of violations of international humanitarian law in Rwanda in 1994. The objective was to *prosecute and punish* the perpetrators of the atrocities in Rwanda in such a way as to put an end to impunity and promote national reconciliation and the restoration of peace." (emphasis added)); Prosecutor v. Blagojevic & Jokic, Case No. IT-02-60-T, Judgement, ¶ 814 (Jan. 17, 2005) (stating that the International Tribunal for the Former Yugoslavia seeks to impose punishment that "reflect[s] both the calls for justice from the persons who have – directly or indirectly – been victims of the crimes, as well as respond to the call from the international community as a whole to end impunity for massive human rights violations and crimes committed during armed conflicts").

Consistent with their constituting charters, international criminal tribunals have exercised only criminal jurisdiction to punish offenders. None has ever exercised a power to make compensatory civil awards to victims.[26] These tribunals have on occasion made clear that the criminal violations they found may give rise to a claim for civil compensatory liability, and at times, have explicitly said that conduct which does *not* justify criminal punishment may nonetheless support a claim for compensatory damages.[27]

International law not only recognizes differences between criminal and civil liability, but treats them differently. While international institutions have occasionally been established to impose criminal punishments for egregious violations of international law, and treaties often impose on nations the obligation to punish criminal violations,[28] the basic position of international

---

[26] The distinction between criminal and civil enforcement of international law is also recognized in many multilateral agreements. Most prominently, the Torture Convention requires each State party to criminally prosecute acts of torture or to extradite the alleged torturers to other States for prosecution. Then, on the subject of compensatory civil liability, it obligates each State party to "ensure in its legal system that the victim of an act of torture . . . has an enforceable right to *fair and adequate compensation* including the means for as full rehabilitation as possible." Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 14, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85.

[27] *See, e.g.*, Prosecutor v. Furundzija, Case No. IT-95-17/1, Trial Chamber Judgment, ¶ 155 (Dec. 10, 1998) (explaining that victims of officially sanctioned torture "could bring a civil suit for damage in a foreign court"); VI *Trials of War Criminals Before the Nuernberg Military Tribunals* 1207-08 (1952) ("[T]here may be both civil and criminal liability growing out of the same transaction. In this case Flick's acts and conduct contributed to a violation of Hague Regulation 46[,] that is, that private property must be respected. . . . But his acts were not within his knowledge intended to contribute to a program of 'systematic plunder' [and therefore cannot be punished criminally].").

[28] *See, e.g.*, Rome Statute, art. 5 (vesting ICC with jurisdiction over the crime of genocide, crimes against humanity, war crimes, and the crime of aggression);

law with respect to civil liability is that States may impose civil compensatory liability on offenders, or not, as they see fit. As Professor Oscar Schachter explains,[29] international law does not ordinarily speak to "the opportunities for private persons to seek redress in domestic courts for breaches of international law by States. There is no general requirement in international law that States provide such remedies. By and large, international law leaves it to them to meet their obligations in such ways as the State determines."[30] Oscar Schachter, *International Law in*

---

Convention on the Prevention and Punishment of the Crime of Genocide, art. V, Dec. 9, 1948, S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277 (obligating state parties "to enact, in accordance with their respective Constitutions, the necessary legislation to give effect to the provisions of the present Convention, and, in particular, to provide effective penalties for persons guilty of genocide").

[29] Upon his death in 2003, former Secretary General Kofi Annan described Professor Schachter as the "architect of the legal framework which has guided United Nations peacekeeping for more than 50 years." Wolfgang Saxon, *Oscar Schachter, 88, Law Professor and U.N. Aide*, N.Y. Times, Dec. 17, 2003, at C15.

[30] *See, e.g.*, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 422-23 (1964) ("The traditional view of international law is that it establishes substantive principles for determining whether one country has wronged another. Because of its peculiar nation-to-nation character the usual method for an individual to seek relief is to exhaust local remedies and then repair to the executive authorities of his own state to persuade them to champion his claim in diplomacy or before an international tribunal. Although it is, of course, true that United States courts apply international law as a part of our own in appropriate circumstances, the public law of nations can hardly dictate to a country which is in theory wronged how to treat that wrong within its domestic borders." (citations omitted)); Restatement (Third) of the Foreign Relations Law of the United States § 111, cmt. h (1987) ("In the absence of special agreement, it is ordinarily for the United States to decide how it will carry out its international obligations."); Eileen Denza, *The Relationship Between International Law and National Law*, *in International Law*, 423, 423 (Malcolm Evans ed., 2d ed. 2006) ("[The law of nations] permeates and radically conditions national legal orders, its rules are applied and enforced by national authorities, and national courts are often asked to resolve its most fundamental uncertainties. *Yet international law does not itself prescribe how it should be applied or enforced at the national level.* It asserts its own primacy over national laws, but without invalidating those laws or intruding into national legal

*Theory and Practice* 240 (1991).

This feature of international law is largely explained by the diversity of legal systems throughout the world.  Because the legal systems of the world differ so drastically from one another, any attempt to dictate the manner in which States implement the obligation to protect human rights would be impractical.  "[G]iven the existing array of legal systems within the world, a consensus would be virtually impossible to reach — particularly on the technical accouterments to an action — and it is hard even to imagine that harmony ever would characterize this issue."

---

systems.  National constitutions are therefore free to choose how they give effect to treaties and to customary international law. *Their choice of methods is extremely varied.*" (emphases added)); Louis Henkin, Richard Crawford Pugh, Oscar Schachter & Hans Smit, *International Law: Cases and Materials* 153 (3d ed. 1993) ("Since a state's responsibility to give effect to international obligations does not fall upon any particular institution of its government, *international law does not require that domestic courts apply and give effect to international obligations*. . . . States differ as to whether international law is incorporated into domestic law and forms a part of the 'law of the land,' and whether the executive or the courts will give effect to norms of international law or to treaty provisions in the absence of their implementation by domestic legislation." (emphasis added)); Louis Henkin, *International Law: Politics, Values and Functions* 88 (1990) ("The international system requires that a State meet its international obligations, *but ordinarily the law has not required that a State meet those obligations in a particular way or through particular institutions or laws*." (emphasis added)); *id.* at 251 ("Compliance with international law as to civil and political rights . . . takes place within a State and depends on its legal system, on its courts and other official bodies."); Louis Henkin, *Foreign Affairs and the Constitution* 224 (1972) ("International law itself, finally, does not require any particular reaction to violations of law . . . ."); Michael Koebele, *Corporate Responsibility under the Alien Tort Statute: Enforcement of International Law Through U.S. Torts Law* 208 (2009) ("[I]nternational law leaves individual liability . . . , be it of a natural or legal person, largely to domestic law."); Eric Mongelard, *Corporate Civil Liability for Violations of International Humanitarian Law*, 88 Int'l Rev. Red Cross 665, 671 (2006) ("Legal persons can . . . have obligations under international law, or at least there is a strong tendency to that effect.  However, virtually none of the above [human rights] instruments provides for a mechanism for the enforcement of any liability that may arise or lays down any obligation for non-state entities to make reparation; they leave it to the states party to the treaties to choose how to apply the rules.").

*Tel-Oren*, 726 F.2d at 778 (Edwards, J., concurring).

The ceding to States of the fashioning of appropriate remedies to enforce the norms of the law of nations is readily apparent in the source documents. Characteristically, multilateral treaties protecting human rights include few details. They generally define the rights and duties in question, and direct contracting States to protect such rights under their local laws by appropriate means, sometimes, as noted above, commanding criminal punishment, but rarely dictating any aspects of civil liability. For example, in the Genocide Convention, the "crime of genocide" is defined as a number of "*acts*" committed with "intent to destroy, in whole or in part, a national, ethnical, racial or religious group." Convention on the Prevention and Punishment of the Crime of Genocide, arts. I, II, Dec. 9, 1948, S. Exec. Doc. O, 81-1 (1949), 78 U.N.T.S. 277. The Convention then provides in Article V that the State parties "undertake to enact, in accordance with their respective Constitutions, the necessary legislation to give effect to the provisions of the present Convention, and, in particular, to provide effective penalties for persons guilty of genocide." The Convention leaves the details for realizing its objectives to each nation. It says nothing about the nature or form of "effective penalties" to be imposed. It says nothing about civil and administrative remedies. In short, the Convention defines the illegal act of genocide, obligates State parties to enforce its prohibition, and leaves it to each State to devise its own system for giving effect to the Convention's norms.

In this respect, the Convention is typical. The major instruments that codify the humanitarian law of nations define forms of conduct that are illegal under international law, and

44

obligate States to take appropriate steps to prevent the conduct.[31] They do not instruct on whether, how, or under what circumstances a State may impose civil compensatory liability. They leave those questions to be resolved by each individual nation.

*C. The majority's next argument – that the absence of widespread agreement among the nations of the world to impose civil liability on corporations means that they can have no liability under international law – misunderstands international law and is furthermore inconsistent with the rulings of the Supreme Court and of this circuit.* For their next argument, the majority construct the following syllogism. 1) To determine whether a corporation can be held civilly liable for violation of international law, the place to look is to international law. 2) Principles of local law, even those accepted throughout the world, are not rules of international law, unless

---

[31] *See, e.g.*, International Covenant on Civil and Political Rights, art. 2(3), Dec. 16, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171 ("Each State Party to the present Covenant undertakes . . . To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy . . . ."); Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 2(1), Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 ("Each State Party shall take effective *legislative, administrative, judicial or other measures* to prevent acts of torture in any territory under its jurisdiction." (emphasis added)); International Convention to Suppress the Slave Trade and Slavery, art. 6, Sept. 25, 1926, 46 Stat. 2183, 60 L.N.T.S. 253 (providing that the State parties undertake "to adopt the necessary measures in order that severe penalties may be imposed in respect of such infractions"); United Nations Convention on the Law of the Sea, art. 105, *opened for signature* Dec. 10, 1982, 21 I.L.M. 1261 (providing that upon seizure of vessel or persons engaged in piracy, "*[t]he courts of the State which carried out the seizure may decide upon the penalties to be imposed, and may also determine the action to be taken with regard to the ships, aircraft or property*, subject to the rights of third parties acting in good faith" (emphasis added)); International Convention on the Suppression and Punishment of the Crime of Apartheid, *opened for signature* Nov. 30, 1973, art. IV(b), 1015 U.N.T.S. 243 (obligating State parties "to adopt *legislative, judicial and administrative measures* to prosecute, bring to trial and punish *in accordance with their jurisdiction* persons responsible for" that offense (emphasis added)).

45

they are generally accepted throughout the civilized world *as obligatory rules of international law.* 3) There is no general acceptance in the world of a rule of international law imposing civil liability on corporate defendants for violations of international law. *Ergo*, international law does not allow for imposition of civil liability on corporations.

I have no quarrel with any of the three premises. If properly understood and applied, each is correct. The problem lies in how they are used in the majority opinion and, in particular, the spurious leap from these propositions to the majority's conclusion. Despite the surface plausibility of the majority's argument as it is stated, when one scratches below the surface, the majority's argument is illogical, internally inconsistent, contrary to international law, and incompatible with rulings of both the Supreme Court and this circuit.

I have no disagreement with the first proposition, that the place to look for answers whether any set of facts constitutes a violation of international law is to international law. As improbable as it may seem that international law would give a free pass to corporations to abuse fundamental human rights, one cannot assume the answers to questions of international law without first exploring its provisions. And if we found that international law in fact exempts corporations from liability for violating its norms, we would be forced to accept that answer whether it seemed reasonable to us or not.

However, when one looks to international law to learn whether it imposes civil compensatory liability on those who violate its norms and whether it distinguishes between natural and juridical persons, the answer international law furnishes is that it takes no position on the question. What international law does is it prescribes norms of conduct. It identifies acts

(genocide, slavery, war crimes, piracy, etc.) that it prohibits. At times, it calls for the imposition of criminal liability for violation of the law, whether by vesting a tribunal such as the ICC with jurisdiction to prosecute such crimes or by imposing on States a duty to make the crimes punishable under national law. The majority's proposition that one looks to the law of nations to determine whether there is civil liability for violation of its norms thus proves far less than the majority opinion claims. Yes – the question whether acts of any type violate the law of nations and give rise to civil damages is referable to the law of nations. And if the law of nations spoke on the question, providing that acts of corporations are not covered by the law of nations, I would agree that such a limitation would preclude suits under the ATS to impose liability on corporations.

But international law does not provide that juridical entities are exempt. And as for civil liability of both natural and juridical persons, the answer given by the law of nations (as discussed above) is that each State is free to decide that question for itself. While most nations of the world have not empowered their courts to impose civil liability for violations of law of nations,[32] the United States, by enacting the ATS, has authorized civil suits for violation of the law of nations.[33]

---

[32] Beth Stephens, *Translating* Filártiga*: A Comparative and International Law Analysis of Domestic Remedies for International Human Rights Violations*, 27 Yale J. Int'l L. 1, 17-34 (2002) (reviewing reasons foreign countries have not exercised universal tort jurisdiction over human rights violations).

[33] The majority mischaracterize my position when they attribute to me the view that corporate liability is "merely a question of remedy." Maj. Op. 48; *see also* Maj. Op. 9, 46. As explained throughout this opinion, international law outlaws certain forms of abhorrent conduct and in general leaves to individual nations how to enforce the proscription.

In short, the majority's contention that there can be no civil remedy for a violation of the law of nations unless that particular form of civil remedy has been adopted throughout the world misunderstands how the law of nations functions. Civil liability *under the ATS* for violation of the law of nations is not awarded because of a perception that international law commands civil liability throughout the world. It is awarded in U.S. courts because the law of nations has outlawed certain conduct, leaving it to each State to resolve questions of civil liability, and the United States has chosen through the ATS to impose civil liability. The majority's ruling defeats the objective of international law to allow each nation to formulate its own approach to the enforcement of international law.

I turn to the majority's second and third propositions in support of its syllogism – that principles of local law, even if accepted throughout the world, are not rules of international law unless they are generally accepted throughout the civilized world as obligatory rules of international law and that there is no widespread practice in the world of imposing civil liability for violation of the rules of international law. These propositions are also true, but they are irrelevant to this controversy. If a damage award under the ATS were premised on the theory that international law commands that violators of its norms be liable for compensatory damages, then we would need to determine whether there is general agreement among the nations of the world to such a rule of international law. But the award of damages under the ATS is not based on a belief that international law commands civil liability. The claim that a tort has been committed is premised on a violation of the law of nations. This follows from a determination that an actor has done what international law prohibits. But international law leaves the manner of remedy to the

48

independent determination of each State. *See supra* notes 29-30 and accompanying text; *cf. Sosa*, 542 U.S. at 730 ("The First Congress, which reflected the understanding of the framing generation and included some of the Framers, assumed that federal courts *could properly identify some international norms as enforceable* in the exercise of § 1350 jurisdiction." (emphasis added)). The fact that other nations have not chosen to exercise the discretion left to them by international law in favor of civil liability does not change the fact that international law has left the choice as to civil liability with each individual nation.

A further flaw in the majority's reasoning is its identification of *corporate* civil liability as the principle that has failed to achieve universal approval as a part of the law of nations. The majority's thesis is that when a corporation commits a violation of the law of nations, the victims may sue the natural persons who acted for the corporation, but may not sue the corporation. In the majority's view, that is because there is no widespread acceptance in the world of *corporate* civil liability as a rule of international law. *See* Maj. Op. 10 ("[T]here would need to be not only a few, but so many sources of international law calling for corporate liability that the norm could be regarded as 'universal.'").

But this is a mistaken description of international law. While it is true that there is no rule of international law making corporations civilly liable, that is merely the inevitable consequence of the fact that there is no rule of international law making any private person civilly liable – regardless of whether the person is natural or juridical – and that international tribunals, which have been established to criminally prosecute violations of international law, have never been vested with authority to impose civil, compensatory liability. If the absence of widespread

49

agreement in the world as to civil liability bars imposing liability on corporations, it bars imposing liability on natural persons as well.

The majority's argument thus conflicts with the authority of this court and the Supreme Court. The point of the ATS is to provide a civil remedy to victims of torts committed in violation of the law of nations. In spite of the clear absence of a rule of international law providing for civil liability, we have repeatedly imposed civil liability under the ATS, and the Supreme Court expressly stated in *Sosa*, rejecting the views of the Court minority, that civil tort liability does lie under the ATS. The absence of a wide consensus imposing civil liability has never been construed as barring civil liability. The majority's argument that such absence of wide consensus bars imposition of liability on a corporation places the majority in irreconcilable conflict with the holdings of this court and the teachings of the Supreme Court.

*D. Taking out of context <u>Sosa</u>'s reference to a "norm," which must command virtually universal acceptance <u>as a rule of international law</u> to qualify as a rule of international law, the majority opinion attributes to that concept a meaning the Supreme Court could not possibly have intended.* The majority claim to find support for their argument in a passage of the Supreme Court's *Sosa* opinion. The Court cautioned in *Sosa* that, in order to qualify as a rule of international law, a "norm" must command virtually universal acceptance among the civilized nations as a rule of international law. 542 U.S. at 732. The majority opinion, disregarding the context of the Court's discussion, construes the "norm" under discussion as a convention concerning the type of violator of international law upon whom civil tort liability may be imposed. It postulates that, where a corporation has committed a tort prescribed by the law of

50

nations, liability may not be imposed on it unless there is a "norm" generally accepted throughout the world for the imposition of tort liability on such a corporate violator of the law of nations, as opposed to the natural person tortfeasors who acted on the corporations' behalf.

This is not what the Supreme Court meant. What the Court was addressing in its reference to "norms" was standards of conduct. Some norms (or standards) – those prescribing the most egregious and universally condemned forms of conduct, including genocide, war crimes, and slavery – express rules of the law of nations. Other norms of conduct, even though widely accepted and enforced in the world *as rules of local law*, are not rules of the law of nations and are therefore not obligatory on States. What was required was that the particular standard of conduct violated by the defendant be generally accepted *as a mandatory rule of international law.*

A reading of *Sosa*, and of the cases it describes in this discussion as "generally consistent" with its view, makes clear that all of them are discussing the distinctions between *conduct that does, and conduct that does not, violate the law of nations.* Reinforcing this limitation, the *Sosa* opinion quoted with approval this court's reference in *Filartiga* to conduct that renders one "*hostis humani generis,* an enemy of all mankind," 630 F.2d at 890, Judge Edwards' formulation – "a handful of heinous actions – each of which violates definable, universal, obligatory norms," *Tel-Oren*, 726 F.2d at 781 (Edwards, J., concurring), and the Ninth Circuit's similar observation that "[a]ctionable violations of international law must be of a norm that is specific, universal, and obligatory," *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994). The discussion in *Sosa* used the word "norms" to refer to standards of conduct.

To be sure, the distinction between conduct that does and conduct that does not violate the

law of nations can turn on whether the conduct is done by or on behalf of a State or by a private actor independently of a State. *Sosa* and *Tel-Oren* both spoke of forms of conduct – arbitrary detention and torture – that might violate the law of nations only if done by or on behalf of a State and not if done by a private actor acting independently of the State. But that is a completely different issue from the majority's proposition. The majority are not speaking of conduct which, because done by an actor of specified character, does *not* violate the law of nations. By definition, when conduct does not violate the law of nations, it cannot be the basis of tort liability under the ATS for violation of the law of nations. The majority's rule encompasses conduct that indisputably *does* violate the law of nations, including for example slavery, genocide, piracy, and official torture (done under color of State law) – conduct for which the natural person tortfeasors will be held liable under ATS, but for which, the majority insist, a corporation that caused the conduct to be done and that profited from it, cannot be held liable. Nothing in *Sosa* inferentially supports or even discusses this question.

The Supreme Court, furthermore, could not have meant what the majority opinion attributes to it. The disagreement in *Sosa* that divided the Court was on the question whether the ATS *in any circumstance* authorizes an award of compensatory tort damages. The minority of the Court argued vigorously that no such damages could be awarded without further authorizing legislation by the Congress. *Sosa*, 542 U.S. at 746-47 (Scalia, J., concurring in the judgment). The majority of the Supreme Court disagreed and found that the ATS authorized awards of tort damages for violations of the norms of the law of nations without need for any further legislation. *Id.* at 730 (maj. op.). Had the Supreme Court meant what my colleagues assume it did in this

passage, it could not have maintained its disagreement with the minority. There was no wide adherence among the nations of the world to a rule of civil liability for violation of the law of nations. Had the Supreme Court meant, as my colleagues attribute to it, that no damages may be awarded under ATS absent a universally shared view among the civilized nations that international law provides such a remedy, the Supreme Court would have been forced to conclude, in *agreement* with the minority, that the *Filartiga* line of cases, which awarded damages, was wrongly decided and that there could be no awards of damages under ATS. The majority of the Court, however, spoke with approval of *Filartiga* and the subsequent cases which had awarded damages and unmistakably concluded that damages were awardable under the ATS upon a showing of violation of the norms of conduct constituting part of the law of nations.

The majority's claim to find support for their position in the Supreme Court's reference to the need for a norm to enjoy universal acceptance to qualify as a rule of international law is simply a misunderstanding of the Supreme Court's discussion.[34]

---

[34] The majority's position is also inconsistent with our court's understanding in prior cases of the norms dictated by international law. In prior opinions, we have looked to international law to determine whether the defendant's conduct violated *norms of conduct* universally accepted by the nations of the world as rules of international law. Three of our opinions contain extensive discussion of whether particular forms of conduct contravene customary international law. In *Flores v. Southern Peru Copper Corp.*, 414 F.3d 233 (2d Cir. 2003), a civil suit brought under the ATS *against a corporate defendant*, we surveyed the sources on international law and concluded that acts of intranational pollution did not violate any norm of international law capable of supporting liability under the ATS. In reaching this conclusion, our opinion speaks repeatedly of the "offenses" or "conduct" the corporation allegedly engaged in, and whether such acts violate customary international law. *See, e.g.*, *id.* at 247 ("The determination of what *offenses* violate customary international law . . . is no simple task.." (emphasis added)); *id.* at 249 ("*[O]ffenses* that may be purely intra-national in their execution, such as official torture, extrajudicial killings, and genocide, do violate customary

53

## IV.    The majority's mistaken claim that corporations are not "subjects" of international law

The majority attempt to bolster their argument by employing the arcane terminology of international law. They assert that a corporation is not a "subject" of international law. Maj. Op. 18. The majority explain the significance of this term to be that only subjects of international law have "rights, duties, and liabilities" under international law. Maj. Op. 7. Because, according to the majority, a corporation is not a subject of the law of nations, it may neither bring suit for

international law because the 'nations of the world' have demonstrated that such wrongs are of 'mutual . . . concern,' and capable of impairing international peace and security." (citations omitted and emphasis added)); *id.* at 255 ("The precept that '[h]uman beings are . . . entitled to a healthy and productive life in harmony with nature,' . . . utterly fails to specify what *conduct* would fall within or outside of the law." (emphasis added)); *id.* at 266 ("Because plaintiffs have failed to submit evidence sufficient to establish that *intranational pollution* violates customary international law, the District Court properly granted defendant's motion to dismiss." (emphasis added)). Nothing in the opinion even discussed whether the defendant might be exempt from liability because of its corporate character or whether liability was foreclosed because of the absence of a widely accepted convention among nations for awarding civil damages.

Again in *United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003), we concluded that the act of placing a bomb on a airplane operated by a foreign carrier did not support the exercise of universal criminal jurisdiction, because the nations of the world disagree over which *forms of conduct* constitute "terrorism." Again, our opinion contains an extensive discussion of the forms *of conduct* that are proscribed by international law. *See, e.g.*, *id.* at 104 ("In modern times, the *class of crimes* over which States can exercise universal jurisdiction has been extended to include war crimes and acts identified after the Second World War as 'crimes against humanity.'" (emphasis added)); *id.* at 106 ("Unlike those *offenses* supporting universal jurisdiction under customary international law – that is, piracy, war crimes, and crimes against humanity – that now have fairly precise definitions and that have achieved universal condemnation, 'terrorism' is a term as loosely deployed as it is powerfully charged." (emphasis added)); *id.* at 107 ("[T]here continues to be strenuous disagreement among States *about what actions* do or do not constitute terrorism . . . ." (emphasis added)).

And in *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 183-84 (2d Cir. 2009), *cert. denied*, 78 U.S.L.W. 3049, we wrote, "[T]he norm prohibiting nonconsensual medical experimentation on human subjects has become firmly embedded and has secured universal acceptance in the community of nations."

violations of the law of nations nor be sued for offenses under the law of nations.

The majority, however, cite no authority in support of their assertion that a corporation is not a subject of international law and is therefore incapable of being a plaintiff or a defendant in an action based on a violation of the law of nations. And there is strong authority to the contrary.

The idea that an entity was or was not a "subject" of international had greatest prominence when the rules of international law focused on the sovereign interests of States in their relations with one another. To the extent that a particular rule of international law pertains only to the relationship among States, it can be correct to say that only States are subjects. However, as the law of nations evolved to recognize that "individuals and private juridical entities can have any status, capacity, rights, or duties given them by international law or agreement," Restatement (Third) of the Foreign Relations Law of the United States, pt. II, introductory note,[35] that terminology has come to mean nothing more than asking whether the particular norm applies to the type of individual or entity charged with violating it, as some norms apply only to States and others apply to private non-state actors.

As early as the Nuremberg trials, which represented the dawn of the modern enforcement of the humanitarian component of the law of nations, courts recognized that corporations had

---

[35] *See, e.g.*, *Kadic v. Karadžić*, 70 F.3d 232, 242 (2d Cir. 1995) ("[F]rom its incorporation into international law, the proscription of genocide has applied equally to state and non-state actors."); Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law, art. 15, G.A. Res. 60/147, U.N. Doc. A/RES/60/147 (Dec. 16, 2005) ("In cases where *a person, a legal person, or other entity is found liable for reparation to a victim*, such party should provide reparation to the victim or compensate the State if the State has already provided reparation to the victim" (emphasis added)).

obligations under international law (and were therefore subjects of international law). In at least three of those trials, tribunals found that corporations violated the law of nations and imposed judgment on individual criminal defendants based on their complicity in the corporations' violations.[36]

For example, in the Farben case, the Farben personnel were charged in five counts with wide-ranging violations of international law, including plunder of occupied properties. VIII *Farben Trial*, at 1129. Nine defendants were found guilty on this count. The tribunal's judgment makes clear that the Farben company itself committed violations of international law. Describing the applicable law, the tribunal stated:

> Where private individuals, *including juristic persons*, proceed to exploit the
> military occupancy by acquiring private property against the will and consent of
> the former owner, such action, not being expressly justified . . ., is in violation of
> international law. . . . Similarly *where a private individual or a juristic person*
> becomes a party to unlawful confiscation of public or private property by planning
> and executing a well-defined design to acquire such property permanently,
> acquisition under such circumstances subsequent to the confiscation constitutes
> conduct in violation of [international law].

*Id.* at 1132-33 (emphasis added). Describing Farben's activities, the tribunal wrote:

> [W]e find that the proof establishes beyond a reasonable doubt that offenses
> against property as defined in Control Council Law No. 10 were committed by
> Farben, and that these offenses were connected with, and an inextricable part of
> the German policy for occupied countries as above described. . . . The action of
> Farben and its representatives, under these circumstances, cannot be differentiated
> from acts of plunder or pillage committed by officers, soldiers, or public officials

---

[36] *See* VI *Trials of War Criminals Before the Nuernberg Military Tribunals* (1952) (the "Flick Trial"); VII, VIII *Trials of War Criminals Before the Nuernberg Military Tribunals* (1952) (the "Farben Trial"); IX *Trials of War Criminals Before the Nuernberg Military Tribunals* (1950) (the "Krupp Trial").

of the German Reich.

*Id.* at 1140.  Then – after concluding that Farben violated international law – the tribunal imposed criminal liability on Farben's employees because of their complicity in violations committed by Farben.

As discussed above in Part II.A, two opinions of the Attorney General of the United States further refute the majority's view that corporations have neither rights nor obligations under international law.  In 1907, the Attorney General rendered an opinion that an American corporation could be held liable under the ATS to Mexican nationals if the defendant's "diversion of the water [of the Rio Grande] was an injury to substantial rights of citizens of Mexico under the principles of international law or by treaty."  26 Op. Att'y Gen. 252, 253 (1907).  And in 1795, shortly after the enactment of the ATS, the Attorney General opined that a British corporation could pursue a civil action under the ATS for injury caused to it in violation of international law by American citizens who, in concert with a French fleet, had attacked a settlement managed by the corporation in Sierra Leone in violation of international law.  *See* 1 Op. Att'y Gen. 57 (1795).

This court similarly recognized claims on behalf of juridical entities (a corporation, a trust, and a partnership) against Cuba, premised on Cuba's expropriation of their property in violation of international law.[37]  These decisions cannot be reconciled with the majority's contention that

---

[37] *See, e.g.*, *Banco Nacional de Cuba v. Chem. Bank N.Y. Trust Co.*, 822 F.2d 230, 236-37 (2d Cir. 1987); *Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d 875, 894 (2d Cir. 1981); *Banco Nacional de Cuba v. First Nat'l City Bank of N.Y.*, 478 F.2d 191, 193 (2d Cir. 1973); *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 170, 185 (2d Cir. 1967); *Banco Nacional*

corporations are not subjects of under international law.

**V.      The absence of scholarly support for the majority's rule**

The majority contend that the "teachings of the most highly qualified publicists of the various nations" support their strange view of international law.  Maj. Op. 28 n.36.  The opinion seems to suggest that all those works of scholarship that discuss the actual state of the law, as opposed to those which advocate for the scholars' aspirational preferences, agree with the majority's view.  I have discovered no published work of scholarship that supports the majority's rule.  While they cite eminent works of scholarship for many other propositions that I do not dispute, none of those works supports, or even addresses, the majority's claim that corporations are exempted by international law from the obligation to comply with its rules.

The majority open their discussion by quoting the Supreme Court's well known observation in *The Paquete Habana*, 175 U.S. 677 (1900), that "*the works of* jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat" can furnish valuable "evidence" of customary international law.  *Id.* at 700 (emphasis added).  The Supreme Court relied on the leading treatises in the field, such as Wharton's *Digest of the International Law of the United States* and Wheaton's treatise on international law, as well as on "leading French treatises on international law," such as De Cussy's *Phases et Causes Celebres du Droit Maritime des Nations,* Ortolan's *Regles Internationales et Diplomatie de la Mer*, and De Boeck's *de la Propriete Privee*

---

*de Cuba v. Sabbatino*, 307 F.2d 845, 864 (2d Cir. 1962), *rev'd on other grounds*, 376 U.S. 398 (1964), *superseded by statute,* 22 U.S.C. § 2370(e)(2).

*Ennemie sous Pavillon Ennemi.*

The majority opinion, in contrast, does not cite a single published work of scholarship – no treatise on the law of nations, no published book on the subject, and no article in a scholarly journal – in support of its position.[38]  If the prescriptions of international law against inhumane acts do not apply to corporations, which are therefore free to disregard them without liability, one would think this would be sufficiently interesting to warrant comment, or at least acknowledgment, in some published work of scholarship.  The majority cite none.  No reference to this strange view is found for example in *Oppenheim's International Law*, Brierley's *The Law of Nations* or the American Law Institute's Restatements of the Foreign Relations Law of the United States, or in any of the numerous learned works the majority cite.

The majority opinion claims that its view is supported in two unpublished documents –

---

[38] The majority do cite one published book, Michael Koebele, *Corporate Responsibility Under the Alien Tort Statute: Enforcement of International Law Through U.S. Torts Law* (Nijhoff 2009), in a manner suggesting that it supports the majority's analysis, but once again the quotation is out of context.  The majority quote this work to the effect that it remains the "prevailing view" among scholars that international law "primarily regulates States and in limited instances such as international criminal law, individuals, but not [transnational corporations]."  Maj. Op. 43-44.  This quotation appears to support the majority's position, but when one places it in context, the appearance of support disappears.  Koebele's book later explains that "the ATS, although incorporating international law, is still governed by and forms part of torts law which applies equally to natural and legal persons unless the text of a statute provides otherwise," and that international law does not prevent a State "from raising its standards by holding [transnational corporations] which are involved [in] or contribute to violations of international law liable as long as the cause of international law is served because international law leaves individual liability (as opposed to State liability), be it of a natural or a legal person, largely to domestic law."  Koebele, *supra*, at 208.  Koebele thus recognizes that the imposition of tort liability on a corporation under the ATS is entirely consistent with international law.

59

affidavits by law professors submitted in another litigation by corporate defendants in an effort to get the case against them dismissed.[39] (The majority opinion ignores opposing affidavits filed in the same litigation.) My colleagues assert that those affidavits by two renowned professors of international law, Professors James Crawford and Christopher Greenwood, "have forcefully declared . . . that customary international law does not recognize liability for corporations that violate its norms." Maj. Op. 43. This characterization is not strictly speaking false but any implication that the professors' affidavits support the majority's view – that corporate violations of international law can give rise to civil liability of the natural persons who acted for the corporation but not of the corporation itself – is completely unwarranted.

Professor Crawford's affidavit, which was filed by the corporate defendant in *Presbyterian Church of the Sudan v. Talisman Energy, Inc.*, Dkt. No. 07-0016, does not discuss, much less espouse, the majority's theory. Its subject matter is very limited. The affidavit was prepared in response to a question put to the litigants during argument of the appeal by Judge Cabranes. Judge Cabranes requested further briefing on the question:

> What country or international judicial tribunal has recognized corporate liability, as opposed to individual liability, in a civil or criminal context on the basis of a violation of the law of nations or customary international law?

Professor Crawford makes clear in his affidavit that he limits himself to answering that question – whether any international or foreign judicial decision has imposed liability on a corporation

---

[39] It is not self-evident that unpublished expert affidavits submitted in a different litigation are what the Supreme Court had in mind in *Paquete Habana* when it approved consultation of "*the works of* jurists and commentators" and, under that rubric, cited leading works of published scholarship.

"under international law as such." Crawford Decl. ¶ 5. The Professor answers that he knows of no such decision.[40]

I have no quarrel with Professor Crawford's statement that no national court outside the United States or international judicial tribunal has as yet imposed civil liability on a corporation on the basis of a violation of the law of nations. It adds nothing to our debate. To begin with, his observation is particularly without significance as justification of the majority's distinction between liability of natural persons and liability of corporations because Professor Crawford does not state that any nation outside the United States awards civil damages against any category of defendant for violations of the law of nations. If there are no civil judgments outside the United States against natural persons, the fact that there are no civil judgments against corporations either in no way supports the distinction the majority are making.

Professor Crawford's affidavit furthermore does not address the rule the majority attribute to international law. International tribunals do not have jurisdiction to impose civil liability on private actors, and the fact that other nations' courts have not awarded civil damages against corporations does not support the majority's theory that the absence of judgments imposing civil

---

[40] Professor Crawford's affidavit does not take the position that there is any obstacle to a national court holding a corporation civilly liable – only that no such decision has yet has been rendered. The affidavit notes that a study by the International Commission of Jurists on corporate complicity in human rights violations states that corporations are in a "zone of legal risk," Crawford Decl. ¶ 7, but cites no examples of decisions actually holding them liable. In speaking of the experience of the United Kingdom, Professor Crawford characterizes the question of corporate liability as "largely untested." *Id.* ¶ 8. And as far as international tribunals are concerned, the Professor explains that the reason for the absence of judgments against corporations is that the international tribunals do not have jurisdiction to award such judgments. "None have jurisdiction over corporations as respondents." *Id.* ¶ 9.

liability somehow *bars* a national court, such as a U.S. court acting under the ATS, from imposing civil liability on a corporation for its violation of international law.

I do not contend that the law of nations imposes civil damages, either on corporations or on natural persons. Quite to the contrary, the law of nations does not take a position on civil liability of either natural persons or corporations. It leaves the question of civil liability to each nation to resolve for itself. By passing the ATS, Congress resolved that question for the United States, unlike the great majority of nations, in favor of civil liability. Nothing in Professor Crawford's affidavit is to the contrary.

In fact, Professor Crawford's affidavit seems rather to express oblique support for my view. In noting that no national tribunal outside the United States has imposed civil liability on a corporation on the basis of a violation of the law of nations, the Professor notes the need for a "clarification." He then explains,

> When the terms of an international treaty become part of the law of a given state – whether (as in most common law jurisdictions) by being enacted by parliament or (as in many civil law jurisdictions) by virtue of constitutional approval and promulgation which give a self-executing treaty the force of law – *corporations may be civilly liable for wrongful conduct contrary to the enacted terms of the treaty* just as they may be liable for any other conduct recognized as unlawful by that legal system.

*Id.* ¶ 4 (emphasis added). That is more or less the circumstance when a plaintiff sues in U.S. courts under the ATS to impose civil compensatory liability for a violation of international law. The ATS provides jurisdiction over "a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Norms of international law, such as the outlawing of genocide by the Genocide Convention, have the force of law in the United States and may be

the subject of a suit under the ATS. Because the law of nations leaves each nation free to determine for itself whether to impose civil liability for such violations of the norms of the law of nations, and because the United States by enacting the ATS has opted for civil tort liability, U.S. courts, as a matter of U.S. law, entertain suits for compensatory damages under the ATS for violations of the law of nations. The ATS confers jurisdiction by virtue of the defendant's violation of the law of nations. Damages are properly awarded under the ATS not because any rule of international law imposes damages, but because the United States has exercised the option left to it by international law to allow civil suits. Nothing in international law bars such an award, and nothing in Professor Crawford's affidavit suggests the contrary.[41]

---

[41] Another aspect of the majority's citation of Professor Crawford's declaration requires clarification. The majority opinion quotes the declaration as saying, "[n]o national court [outside the United States] and no international judicial tribunal has so far recognized corporate liability, *as opposed to individual liability*, *in a civil or criminal context* on the basis of a violation of the law of nations." Maj. Op. 43 (first emphasis added). The manner of presenting the quotation could lead the reader to understand that the Professor, like the majority, is saying that when a corporation violates the law of nations, that law recognizes civil liability *of natural persons who acted for the corporation,* but *not of the corporations.* That is not what the Professor was saying. When Professor Crawford responded that no national court outside the United States or international judicial tribunal had imposed corporate liability, "as opposed to individual liability," he was merely adhering to the precise question asked. He was not suggesting, as the majority opinion does, that civil liability of natural persons is judged differently from civil liability of corporations. His affidavit contains no discussion whatsoever of whether any national court or international judicial tribunal has recognized civil liability of natural persons, and he makes no statement one way or the other on the question of such liability.

63

The majority also quote from an affidavit of Professor Christopher Greenwood, filed in the district court in the *Talisman* case. The majority's quotation from the Greenwood affidavit contributes nothing to this dispute. According to the majority, the Professor's affidavit states, "[T]here is not, and never has been, any assertion of the criminal liability of corporations in international law." Maj. Op. 43. As I have explained above, I have no quarrel with that assertion, but it has no bearing on whether corporations may be held civilly liable under ATS for violations of international law. The reasons international tribunals do not impose *criminal* liability on corporations have to do only with the nature of *criminal* liability and a widespread perception that *criminal liability* is neither theoretically sound nor practically efficacious when imposed on a juridical entity. This says nothing about the imposition of compensatory civil liability.[42]

---

One of the main problems with the majority's theory is its incoherence resulting from the fact that it treats the absence of any international law precedent for imposition of damages on corporations as barring such an award under the ATS, while acknowledging that damages are properly awarded against natural persons notwithstanding the very same absence of international law precedent for such awards. The quotation from Professor Crawford's affidavit in the majority opinion sounds as if the Professor is saying that international law distinguishes between civil liability of natural persons, which it allows, and civil liability of corporations, which it does not allow. But the Professor was not saying that. His affidavit does not discuss, much less support, the majority's theory that, when a corporation violates the law of nations, civil liability under the ATS *may be imposed on the natural persons who acted for the corporation* but not on the corporation. The ambiguity in Professor Crawford's sentence does not indicate adoption of the majority's incoherent and inconsistent proposition.

[42] The majority contend that I criticize them for citing affidavits. They assert that affidavits, because they are made under penalty of perjury, are as reliable a source as law review articles "whose accuracy is confirmed only by efforts of the student staff of law journals." Maj. Op. 44 n.47. I do not criticize the majority for citing the affidavits of learned professors. I have only questioned whether unpublished litigating affidavits are what the Supreme Court had in mind in *Paquete Habana* as the "teachings" of publicists. Regardless, I have no criticism of the affidavits of Professors Crawford and Greenwood. The problem with the majority's citation of

The majority cite no work of scholarship that supports their position, and fail to acknowledge scholarship that rejects their view. Professor Schachter and other scholars assert that international law leaves the question of civil liability to be determined by individual nations. *See supra* note 29 and accompanying text. A three-volume report of the International Commission of Jurists on the subject of "Corporate Complicity and Legal Accountability"[43] distinguishes between criminal and civil liability and provides as to civil liability that "*the law of civil remedies will always have the ability to deal with the conduct of companies, individuals and state authorities*." 3 Int'l Comm. of Jurists, *Corporate Complicity & Legal Accountability* 5 (2008). The report maintains that this is the case notwithstanding that "significant opposition to the imposition of *criminal* sanctions on companies as legal entities remains," for "reasons [that] appear to be broadly conceptual, and at times political."[44] 2 Int'l Comm. of Jurists, *Corporate Complicity & Legal Accountability* 57 (2008) (emphasis added). Michael Koebele's work asserts that liability under the ATS "applies equally to natural and legal persons" and that international law does not bar States from imposing liability on a corporation, as international law leaves civil liability to domestic law. Michael Koebele, *Corporate Responsibility Under the Alien Tort*

---

those affidavits is that the affidavits do not support the majority's thesis.

[43] Int'l Comm. of Jurists, *Corporate Complicity & Legal Accountability* (2008), *available at* http://www.icj.org/default.asp?nodeID=350&langage=1&myPage=Publications.

[44] *See infra* note 46.

*Statute: Enforcement of International Law Through U.S. Torts Law* 208 (2009).[45]  Two treatises on the ATS maintain that a corporation may be held civilly liable for engaging in conduct that violates the law of nations.  Beth Stephens et al., *International Human Rights Litigation in U.S. Courts* 310 (2d ed. 2008) ("Nothing in the *Sosa* decision demands more of plaintiffs seeking to hold corporations accountable for human rights violations than the strict evidentiary requirements imposed generally . . . ."); Peter Henner, *Human Rights and the Alien Tort Statute: Law, History, and Analysis* 215 (2009) ("Alleged perpetrators of crimes under international law that do not require any showing of state action, including piracy, genocide, crimes against humanity, enslavement, and slave trading, can be sued under the ATS.  Generally, *the prospective private defendants can be individuals, corporations, or other entities.*" (emphasis added)).[46]

---

[45] While the majority dismiss Professor Steven R. Ratner's discussion as merely aspirational, they do not acknowledge his assertion, based on a report of the International Council on Human Rights, judgments of the Nuremberg Tribunals, multilateral instruments imposing obligations on corporations, the multimillion dollar settlements agreed to by German companies alleged to have been complicit in the wartime human rights violations of the Third Reich, and the practice of the European Union, that "international law has *already effectively recognized* duties of corporations."  Steven R. Ratner, *Corporations and Human Rights: A Theory of Legal Responsibility*, 111 Yale L.J. 443, 475 (2001) (emphasis added).

[46] The majority criticize the report of the International Commission of Jurists and the Stephens treatise as biased sources.  Maj. Op. 44 n.47.  They point out that certain authors of the Stephens treatise serve as counsel for the Plaintiffs in this case.  That is indeed a reason to view the conclusions of the treatise with skepticism.  The majority's condemnation of the International Commission of Jurists, on the ground that it "promot[es] the understanding and observance of the rule of law and the legal protection of human rights throughout the world," is less convincing.  I do not understand why an organization's commitment to upholding the law justifies the view that the organization is biased as to the content of the law.  But in any event, the views expressed in those scholarly works are consistent with the views of scholars the majority have not questioned.  In contrast, no work of scholarship, whether interested or not interested, has supported the majority's view.

To be sure, the scholarship of international law includes statements of scholars to the effect that international law imposes no liabilities on private juridical persons. This is entirely accurate, but it does not mean what the majority contend. It is true that international law, of its own force, imposes no liabilities on corporations or other private juridical entities.[47] International criminal tribunals, for reasons that relate solely to the nature of criminal liability and punishment, do not exercise jurisdiction over corporations. And as for civil liability of private persons, international law leaves individual nations free to decide whether to implement its norms of conduct by providing civil compensatory liability to victims. *See supra* notes 29-30 and accompanying text. Accordingly, it is absolutely correct that the rules of international law do not provide civil liability against any private actor and do not provide for any form of liability of corporations. In no way, however, does it follow that international law's rules do not apply to corporations.

No work of scholarship cited in the majority opinion supports the majority's rule, and many works of scholarship assert the contrary.

**VI.     Response to the majority's criticism of my arguments**

*There is no inconsistency between my present position and my prior endorsement in Talisman of the reasoning set forth by Judge Katzmann in Khulumani.* The majority assert that

---

[47] Because I agree that international law does not of its own force impose liability on corporations, the majority assert that "Judge Leval does not disagree with Part II" of their opinion. Maj. Op. 45. To the contrary, while certain facts mentioned there are entirely accurate, I disagree with numerous unwarranted inferences and conclusions the majority draw from them.

the position I now take contradicts the position I took in *Talisman* when I approved the reasoning

Judge Katzmann set forth in *Khulumani*. They say I now "ignore" the international tribunals

whose rulings I and Judge Katzmann previously found controlling, that I ignore "the second step"

of Judge Katzmann's approach, and that I "look to international tribunals only when they supply a

norm with which [I agree]." Maj. Op. 48. These criticisms misunderstand both Judge

Katzmann's arguments and mine. There is no inconsistency between my prior endorsement of the

views Judge Katzmann expressed in *Khulumani* and those I express here. I do not ignore the

judgments of international tribunals. I merely decline to draw illogical and unwarranted

conclusions from them.

In *Khulumani*, one of the main issues in dispute was whether civil liability for violations

of international law may be imposed on an actor who participated in the violation of an

international law norm as an aider and abetter. The district court had dismissed claims against

alleged aiders and abetters on the ground that international law recognized no civil liability for

aiding and abetting. *See Ntsebeza v. Citigroup, Inc.*, 346 F. Supp. 2d 538, 554 (S.D.N.Y. 2004).

Although numerous judgments in criminal proceedings had imposed criminal liability for aiding

and abetting, the district court accorded them no significance, because they were *criminal*

judgments which the district court believed were inapplicable to civil liability. Judge Katzmann

found this reasoning erroneous and pointed out that we have "consistently relied on criminal law

norms in establishing the content of customary international law for purposes of the AT[S]."

*Khulumani*, 504 F.3d at 270 n.5. He concluded that if international criminal tribunals had ruled

that aiding and abetting a violation of the law of nations was itself a violation of the law of

nations, this answered the question posed in a civil suit under the ATS whether aiding and abetting violated the law of nations. He explained, "Once a court determines that the defendants' alleged conduct falls within one of 'the modest number of international law violations with a potential for personal liability' on the defendant's part . . . [t]he common law . . . permits the 'independent judicial recognition of actionable international norms.'" *Id.* at 269-70 (citations omitted). Judge Katzmann, in other words, looked at the norms of conduct established by international courts as violations of international law and concluded that conduct which constitutes a criminal violation of international law also violates international law for purposes of civil liability under the ATS.

I agree completely with Judge Katzmann's reasoning. It does not follow, however, that if international tribunals withhold criminal liability from juridical entities for reasons that have nothing to do with whether they violated the conduct norms of international law, but result only from a perceived inappropriateness of imposing *criminal* judgments on artificial entities, there has been no violation of the norms of international law. Nothing in Judge Katzmann's opinion suggests that he would adopt the majority's position or that he would disagree with mine.

As I have made clear, I do not oppose looking to the instruments of international law to determine whether there has been a violation of international law. That is exactly where one should look. And if they answer the question, that answer is determinative. What I oppose is drawing illogical and unwarranted inferences from the judgments of international tribunals, especially when those inferences are used to support rules that undermine the objectives of international law.

The majority likewise attribute to Judge Katzmann the proposition that there is no distinction in international law between criminal and civil liability. Maj. Op. 46. Once again quoting out of context, the majority misunderstand Judge Katzmann's opinion. As noted above, the district court in *Khulumani* had disregarded the opinions of international tribunals which found violations based on aiding and abetting on the ground that those sources imposed criminal, and not civil, responsibility. Judge Katzmann's observation meant nothing more than that the district court was wrong to consider criminal judgments irrelevant to whether conduct constituted a violation of international law for purposes of civil liability. Judge Katzmann did not endorse, or even comment on, the majority's new proposition that withholding of criminal liability for a reason having nothing to do with whether the conduct norms of international law have been violated requires the conclusion that there has been no violation of international law. Nothing in Judge Katzmann's opinion suggests that, in considering the norms that may be violated by a private actor without State involvement, international law distinguishes between the liability of natural and juridical persons. *Cf. Khulumani*, 504 F.3d at 282 (Katzmann, J., concurring) ("We have repeatedly treated the issue of whether corporations may be held liable under the AT[S] as indistinguishable from the question of whether private individuals may be.").

To be sure, if international criminal tribunals followed a rule that the acts of juridical persons cannot violate international law because international law does not cover them, I, and presumably Judge Katzmann as well, would regard such rulings as determinative for ATS purposes. But international tribunals have made no such rulings. There is no inconsistency between my earlier endorsement of Judge Katzmann's reasoning and the reasoning I follow here.

The majority's other criticisms of my opinion merely restate their arguments. I have answered these above.

**VII.    The Complaint must be dismissed because its factual allegations fail to plead a violation of the law of nations.**

Although I do not share my colleagues' understanding of international law, I am in complete agreement that the claims against Appellants must be dismissed.[48] That is because the pertinent allegations of the Complaint fall short of mandatory standards established by decisions of this court and the Supreme Court. We recently held in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009), that liability under the ATS for *aiding and abetting* in a violation of international human rights lies only where the aider and abettor acts *with a purpose* to bring about the abuse of human rights. *Id.* at 259. Furthermore, the Supreme Court ruled in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), that a complaint is insufficient as a matter of law unless it pleads specific facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. When read together, *Talisman* and *Iqbal* establish a requirement that, for a complaint to properly allege a defendant's complicity in human rights abuses perpetrated by officials of a foreign government, it must plead specific facts supporting a reasonable inference that the defendant acted with a purpose of bringing about the abuses. The allegations against Appellants in these appeals do not satisfy this standard. While the Complaint plausibly alleges that Appellants knew of human rights abuses committed by

---

[48] By "Complaint," I refer to the amended complaint filed in May 2004. *See infra* Part VII.A.3.

71

officials of the government of Nigeria and took actions which contributed indirectly to the commission of those offenses, it does not contain allegations supporting a reasonable inference that Appellants acted with a purpose of bringing about the alleged abuses.

*A.  Factual and procedural background*

Because the majority opinion focuses on the legal issue of whether international law allows a U.S. court to impose liability on a corporation, it is necessary to set out the allegations of the Complaint and the history of prior proceedings in detail.

*1) Parties.*  As the majority note, Plaintiffs are, or were, residents of the Ogoni region of Nigeria.  Plaintiffs allege that they (and others similarly situated whom they undertake to represent as a class) were victims of human rights abuses committed by the government of Nigeria, through its military and police forces, with the aid of Shell.  "Shell," as the designation is used in the Complaint and this opinion, refers collectively to the Royal Dutch Petroleum Company and Shell Transport and Trading Company PLC.[49]  According to the allegations of the Complaint, those two entities are holding companies organized respectively in the Netherlands and the United Kingdom.  They conduct petroleum exploration and production operations in Nigeria through a Nigerian subsidiary named Shell Petroleum Development Company of Nigeria, Ltd. (hereinafter "SPDC").  SPDC was named as a defendant, and is not a party to this appeal.  The district court dismissed the suit against SPDC for lack of personal jurisdiction on June 21,

---

[49] Because of changes in corporate form unrelated to this lawsuit, Shell Petroleum N.V. and Shell Transport and Trading Company, Ltd. are the successors to the named defendants Royal Dutch Petroleum Company and Shell Transport and Trading Company PLC, respectively.

2010.

*2) Allegations of the complaint.* Plaintiffs' suit asserts the liability of Shell on the ground that Shell aided and abetted Nigerian government forces in the commission of various human rights abuses, directed against Plaintiffs. The Complaint alleges the following:

Since 1958, SPDC, has been engaged in oil exploration and production in Nigeria, conducting extensive operations in the Ogoni region.[50] Ogoni residents initiated the Movement for Survival of Ogoni People (MOSOP) to protest environmental damage caused by SPDC's operations. Beginning in 1993, the Nigerian military engaged in a campaign of violence against MOSOP and the Ogoni, which was "instigated, planned, facilitated, conspired, and cooperated in" by Shell and SPDC.

In February 1993, following a demand by MOSOP for royalties for the Ogoni people, Shell and SPDC officials met in the Netherlands and England in February 1993 to "formulate a strategy to suppress MOSOP and to return to Ogoniland." In April 1993, SPDC called for assistance from government troops. The Nigerian government troops fired on Ogoni residents protesting a new pipeline, killing eleven. Later, SPDC's divisional manager wrote to the Governor of Rivers State (in which Ogoni is located) and requested "the usual assistance" to protect the progress of SPDC's further work on the pipeline. In August through October 1993, the Nigerian military attacked Ogoni villages, killing large numbers of civilians. SPDC provided

---

[50] The designation "Shell," as noted above, represents holding companies in England and Holland, which wholly own The Shell Petroleum Company Ltd., a holding company, which in turn owns SPDC. SPDC is the sole operator and 30% owner of a joint venture engaged in oil exploration, refinement, and extraction in Nigeria.

a helicopter and boats for reconnaissance, provided transportation to the Nigerian forces involved, provided SPDC property as a staging area for the attacks, and provided food and compensation to the soldiers involved in the attacks. In an operation in October 1993, SPDC employees accompanied Nigerian military personnel in an SPDC charter bus to a village where the military personnel fired on unarmed villagers.

In December 1993, SPDC's managing director, with the approval of Shell, asked the Nigerian Police Inspector General to increase security in exchange for providing Nigerian forces with salary, housing, equipment, and vehicles. Shortly thereafter, the Nigerian government created the Rivers State Internal Security Task Force (ISTF). Shell and SPDC provided financial support for the ISTF's operations, as well as transportation, food, and ammunition for its personnel. In April 1994, the Rivers State Military Administrator ordered the ISTF to "'sanitize' Ogoniland, in order to ensure that those 'carrying out ventures . . . within Ogoniland are not molested.'" The head of the ISTF responded in May that "Shell operations still impossible unless ruthless military operations are undertaken for smooth economic activities to commence."

From May to August 1994, the ISTF engaged in numerous nighttime raids on Ogoni towns and villages. During these raids, the ISTF "broke into homes, shooting or beating anyone in their path, including the elderly, women and children, raping, forcing villagers to pay 'settlement fees,' bribes and ransoms to secure their release, forcing villagers to flee and abandon their homes, and burning, destroying or looting property," and killed at least fifty Ogoni residents. Plaintiffs and others were arrested and detained without formal charges and without access to a civilian court system, some for more than four weeks. In the detention facility, Plaintiffs and

others were beaten and were provided inadequate medical care, food, and sanitary facilities. SPDC officials "frequently visited the . . . detention facility" and "regularly provided food and logistical support for the soldiers" who worked there.

In 1994, the Nigerian military created a "Special Tribunal" to try leaders of MOSOP, including Dr. Barinem Kiobel, a Rivers State politician who objected to the tactics of the ISTF and supported MOSOP. Counsel to those brought before the Special Tribunal were "subjected to actual or threatened beatings or other physical harm." The Complaint alleges also that, with Shell's complicity, witnesses were bribed to give false testimony before the Special Tribunal. In January 1995, the Nigerian military violently put down a protest against Shell's operations and the Special Tribunal, and the protesters who were detained were subjected to "floggings, beatings and other torture[,] and money was extorted to obtain releases." Dr. Kiobel and others were condemned to death by the Special Tribunal and executed in November 1995.

*3) Prior proceedings*. In September 2002, Plaintiffs filed a putative class action in the United States District Court for the Southern District of New York alleging torts in violation of the law of nations, pursuant to the ATS. The amended complaint filed in May 2004 ("the Complaint") charged seven counts of violations of the law of nations against Shell and SPDC. With respect to each count, the Complaint alleged that Shell and SPDC "aided and abetted," "facilitated," "participated in," "conspired with," and/or "cooperated with" the Nigerian military in its violations of the law of nations.

Shell moved to dismiss on several grounds, including that the Complaint failed to state a violation of the law of nations with the specificity required by the Supreme Court's ruling in

*Sosa. Kiobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457, 459 (S.D.N.Y. 2006).[51] The district court granted the motion in part and denied it in part.

The court first determined that "where a cause of action for violation of an international norm is viable under the ATS, claims for aiding and abetting that violation are viable as well." *Id.* at 463-64. Turning to the substantive counts, the district court dismissed the claims of aiding and abetting property destruction, forced exile, extrajudicial killing, and violation of the rights to life, liberty, security, and association, on the ground that international law did not define those violations, as alleged, with the particularity required by *Sosa*. By contrast, the court denied the motion to dismiss the claims that Shell aided and abetted the Nigerian government's commission of torture, arbitrary arrest and detention, and crimes against humanity, concluding that such acts are clear violations of the law of nations. *Id.* at 464-67.

The district court certified its order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). *Id.* at 468. On December 27, 2006, we granted Plaintiffs' petition and Shell's cross-petition to entertain the interlocutory appeal. *See Kiobel v. Royal Dutch Petroleum Co.*, Nos. 06-4800-cv, 06-4876-cv (2d Cir. Dec. 27, 2006).

*B. Adequacy of the pleadings against Shell*

Shell contends the Complaint does not sufficiently plead facts that would render it liable

---

[51] Shell also moved to dismiss on the grounds that Plaintiffs' claims are barred by the act of state doctrine and by the doctrine of international comity. All of these motions were denied and were not appealed. *Kiobel*, 456 F. Supp. 2d at 459.

for aiding and abetting Nigeria's violations of the law of nations.[52] In my view, this argument is dispositive.

*1) Standard of review*. Whether a complaint asserts a claim upon which relief may be granted is a question of law. This court reviews a district court's ruling on a such a question *de novo*. *See Chapman v. New York State Div. for Youth*, 546 F.3d 230, 235 (2d Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible on its face*.'" *Iqbal*, 129 S. Ct. at 1949 (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Facial plausibility" means that the plaintiff's factual pleadings "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint that pleads facts that are "merely consistent with" a defendant's liability is not plausible. *Id.*

Conclusory allegations that the defendant violated the standards of law do not satisfy the need for plausible factual allegations. *Twombly*, 550 U.S. at 555 (holding that "courts are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)); *see also Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006)

---

[52] Plaintiffs contend we should not consider this question because the district court did not consider it and Shell did not raise the issue in its petition for permission to appeal. On interlocutory appeal pursuant to § 1292(b), however, "our Court 'may address any issue fairly included within the certified order,' as 'it is the order that is appealable, and not the controlling question identified by the district court.'" *Cal. Pub. Employees' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 95 (2d Cir. 2004) (quoting *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205 (1996)); *see also Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 962 n.7 (3d Cir. 1983) ("On a § 1292(b) appeal we consider all grounds which might require a reversal of the order appealed from."). The issue has been fully briefed and I see no reason not to consider it.

("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss." (internal quotation marks and citation omitted) (second alteration in original)). This requirement applies to pleadings of intent as well as conduct. *See Iqbal*, 129 S. Ct. at 1954.

*2) Inadequacy of the pleadings.* The Complaint asserts three theories of Shell's liability. First, it alleges that Shell itself aided and abetted the government of Nigeria in the government's commission of various human rights violations against the Ogoni. Alternatively, it asserts that Shell is liable on either of two theories for the actions of its subsidiary SPDC – either as SPDC's alter ego, or as SPDC's principal on an agency theory. I address each theory in turn.

*a) Shell's direct involvement as aider and abetter*. The Complaint pleads in a general manner that Shell

> willfully . . . aided and abetted SPDC and the Nigerian military regime in the joint plan to carry out a deliberate campaign of terror and intimidation through the use of extrajudicial killings, torture, arbitrary arrest and detention, military assault against civilians, cruel, inhuman and degrading treatment, crimes against humanity, forced exile, restrictions on assembly and the confiscation and destruction of private and communal property, all for the purpose of protecting Shell property and enhancing SPDC's ability to explore for and extract oil from areas where Plaintiffs and members of the Class resided.

It pleads also in conclusory form that the Nigerian military's campaign of violence against the Ogoni was "instigated, planned, facilitated, conspired and cooperated in" by Shell. Such pleadings are merely a conclusory accusation of violation of a legal standard and do not withstand the test of *Twombly* and *Iqbal*. They fail to "state a claim upon which relief can be granted."

Fed. R. Civ. P. 12(b)(6); *see Twombly*, 550 U.S. at 555; *Kirch*, 449 F.3d at 398.

The Complaint goes on to assert (1) that SPDC and Shell met in Europe in February 1993 and "formulate[d] a strategy to suppress MOSOP and to return to Ogoniland," (2) that "[b]ased on past behavior, Shell and SPDC knew that the means to be used [by the Nigerian military] in that endeavor would include military violence against Ogoni civilians," and (3) that "Shell and SPDC" provided direct, physical support to the Nigerian military and police operations conducted against the Ogoni by, for example, providing transportation to the Nigerian forces; utilizing Shell property as a staging area for attacks; and providing food, clothing, gear, and pay for soldiers involved.

These allegations are legally insufficient to plead a valid claim of aiding and abetting because they do not support a reasonable inference that Shell provided substantial assistance to the Nigerian government *with a purpose to advance or facilitate* the Nigerian government's violations of the human rights of the Ogoni people. As outlined in Judge Katzmann's opinion in *Khulumani*, 504 F.3d 254, and adopted as the grounds of our recent decision in *Talisman*, 582 F.3d 244, "a defendant may be held liable under international law for aiding and abetting the violation of that law by another [only if] the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the *purpose* of facilitating the commission of that crime." *Id.* at 258 (emphasis added) (quoting *Khulumani*, 504 F.3d at 277).

The allegation that representatives of Shell and its Nigerian subsidiary met in Europe "to formulate a strategy to suppress MOSOP and to return to Ogoniland" implies neither an intent to

79

violate human rights nor the provision of substantial assistance in human rights abuses. Neither of the alleged goals – to "suppress MOSOP" and "return to Ogoniland" – implies that human rights abuses would be involved in carrying them out. The additional allegation that Shell "knew" the Nigerian military would use "military violence against Ogoni civilians" as part of the effort to suppress MOSOP also does not support an inference that Shell *intended* for such violence to occur.[53] As *Talisman* made clear, proof that a private defendant knew of the local government's intent to violate the law of nations is not sufficient to support aider and abetter liability. *Talisman*, 582 F.3d at 259.

The further allegations of providing physical support to the operations of the Nigerian military and police, including transportation, use of SPDC property for staying, food, clothing, gear, and pay for soldiers fail for the same reasons as those which compelled the award of judgment to the defendant in *Talisman.* In *Talisman*, the evidence showed that Talisman Energy, an oil developer with operations in Sudan, had improved roads and air strips used by the Sudanese military to stage attacks on civilians, paid royalties to the Sudanese government, and provided fuel for military aircraft that participated in bombing missions. *Talisman*, 582 F.3d at 261-62. We ruled that the suit could not be maintained because the evidence failed to show a *purpose* of facilitating the Sudanese government's human rights abuses. The plaintiffs' evidence

---

[53] I note the allegation of the Complaint that "SPDC Managing Director Philip B. Watts, with the approval of Shell, requested the Nigerian Police Inspector General to increase SPDC's security . . . to deter and quell community disturbances." Even assuming this allegation suffices to allege action for which Shell would be responsible, a request for increased security and a quelling of disturbances is not a request for human rights violations, such as torture, arbitrary arrest, crimes against humanity, or extrajudicial killing.

showed that the oil company provided assistance to the Sudanese government in order to receive security required for the defendant's oil exploration, and was sufficient to show the assistance was provided with *knowledge* that the Sudanese government would use the defendant's assistance in the infliction of human rights abuses. The evidence, however, was insufficient to support the inference of a *purpose* on the defendant's part to facilitate human rights abuses. *Id.*

Similarly, in this case, Shell is alleged to have provided financial support and other assistance to the Nigerian forces with knowledge that they would engage in human rights abuses. But the Complaint fails to allege facts (at least sufficiently to satisfy the *Iqbal* standard) showing a purpose to advance or facilitate human rights abuses. The provision of assistance to the Nigerian military with *knowledge* that the Nigerian military would engage in human rights abuses does not support an inference of a purpose on Shell's part to advance or facilitate human rights abuses. An enterprise engaged in finance may well provide financing to a government, in order to earn profits derived from interest payments, with the knowledge that the government's operations involve infliction of human rights abuses. Possession of such knowledge would not support the inference that the financier acted with a purpose to advance the human rights abuses. Likewise, an entity engaged in petroleum exploration and extraction may well provide financing and assistance to the local government in order to obtain protection needed for the petroleum operations with knowledge that the government acts abusively in providing the protection. Knowledge of the government's repeated pattern of abuses and expectation that they will be repeated, however, is not the same as a purpose to advance or facilitate such abuses, and the difference is significant for this inquiry.

In sum, the pleadings do not assert facts which support a plausible assertion that Shell rendered assistance to the Nigerian military and police for the purpose of facilitating human rights abuses, as opposed to rendering such assistance *for the purpose* of obtaining protection for its petroleum operations with awareness that Nigerian forces would act abusively. In circumstances where an enterprise requires protection in order to be able to carry out its operations, its provision of assistance to the local government in order to obtain the protection, even with knowledge that the local government will go beyond provision of legitimate protection and will act abusively, does not without more support the inference of a purpose to advance or facilitate the human rights abuses and therefore does not justify the imposition of liability for aiding and abetting those abuses.[54]

---

[54] There is an additional reason why the Complaint fails to state a claim on which relief against Shell may be granted: the pleadings do not support a plausible inference that *Shell*, the parent holding companies, themselves rendered assistance to the Nigerian government. To the contrary, the Complaint alleges that the Shell entities are holding companies based in England and the Netherlands, and that they operate in Nigeria only "through" subsidiaries, specifically SPDC. In light of these concrete allegations regarding corporate form, the conclusory allegations that Shell was complicit in its subsidiary SPDC's rendition of aid to the Nigerian government does not meet the plausibility threshold of *Iqbal*. On the assumption that the Complaint adequately pleads actions of SPDC sufficient to constitute actionable aiding and abetting of Nigeria's human rights abuses, the mere addition of the name of a European holding company to the allegation does not plausibly plead the holding company's involvement.

*b) Vicarious liability of shell for the acts of SPDC.*[55]  In addition to asserting Shell's liability for its own acts of aiding and abetting in human rights violations, the Complaint asserts that Shell is liable for the acts of its subsidiary SPDC, either as an alter ego or as a principal for the acts of its agent because Shell "dominated and controlled SPDC."  "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries."  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  However, this principle of corporate separateness may be disregarded when a subsidiary acts as an agent of its parent.  *See Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265, 267 (2d Cir. 1929) (L. Hand, J.).  The Restatement (Second) of Agency § 1 defines agency as "the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."  A principal is liable for the acts of an agent acting within the scope of the agency.  *See Meyer v.*

---

[55] Because we are dealing with the English and Dutch parents of a Nigerian corporation, a full conflict of laws analysis may reveal that common law vicarious liability standards are not applicable.  As both parties have argued their positions on the basis of the common law, however, I employ the blackletter common law formulations described below for purposes of determining whether Plaintiffs have adequately stated a claim with respect to vicarious liability. In any event, the Dutch law of veil piercing is similar to common law alter ego doctrine, in that it requires a showing that the corporate form has been disregarded or abused to avoid a legal obligation.  *See* Nicola M.C.P. Jägers & Marie-José van der Heijden, *Corporate Human Rights Violations: The Feasibility of Civil Recourse in the Netherlands*, 33 Brook. J. Int'l L. 833, 841-42 & nn. 28, 30 (2008).  Likewise, under English law (which is substantially similar to the law of Nigeria), a court will hold a parent corporation liable when the subsidiary is so totally under the control of the parent that it cannot be said to be carrying on its own business or when the subsidiary is a mere sham or facade.  *See Creasey v. Breachwood Motors, Ltd.*, [1993] BCLC 480, [1992] BCC 638 (Q.B.); *Jones v. Lipman*, [1962] 1 W.L.R. 832, 835 (Ch.) (Eng.).

*Holley*, 537 U.S. 280, 285 (2003); *Karbian v. Columbia University*, 14 F.3d 773, 780 (2d Cir. 1994); Restatement (Second) of Agency § 219.  A principal may also be liable for the unauthorized acts of its agent if, for example, the agent's conduct is aided by the existence of the agency relationship, Restatement (Second) of Agency § 216 cmt. a, or the principal ratifies the agent's acts, *Phelan v. Local 305 of United Ass'n of Journeymen*, 973 F.2d 1050, 1062 (2d Cir. 1992).

A parent corporation may also be held liable for the acts of its subsidiary when the subsidiary is merely an alter ego of the parent.  Alter ego liability exists when a parent or owner uses the corporate form "to achieve fraud, or when the corporation has been so dominated by an individual or another corporation (usually a parent corporation), and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own." *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979) (interpreting New York law).  In deciding whether to pierce the corporate veil, "courts look to a variety of factors, including the intermingling of corporate and [shareholder] funds, undercapitalization of the corporation, failure to observe corporate formalities such as the maintenance of separate books and records, failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder, and the inactivity of other officers and directors." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 18 (2d Cir. 1996).

The Complaint alleges that, "[s]ince operations began in Nigeria in 1958, Shell has dominated and controlled SPDC."  This conclusory allegation does not satisfy the *Iqbal* requirement to plead facts that plausibly support an inference that would justify disregard of the

corporate form or a finding of an agency relationship. The further allegations described above – that Shell and SPDC representatives met in Europe after November 1992 to discuss strategies for suppressing MOSOP and that SPDC did certain acts with the approval of Shell – are likewise insufficient.

Ordinarily, subsidiary corporations are not deemed to be the agents of their corporate parents. *See Kingston Dry Dock*, 31 F.2d at 267 ("Control through the ownership of shares does not fuse the corporations, even when the directors are common to each."). The Complaint does not even plead that Shell and SPDC had an agreement establishing an agency relationship. *Cf. Cleveland v. Caplaw Enters.*, 448 F.3d 518, 523 (2d Cir. 2006) (finding a pleading of corporate agency adequate where the complaint incorporated by reference an agency agreement). Nor does it plead facts showing that they conducted their operations in an agency relationship.[56] The allegations that Shell approved certain conduct undertaken by SPDC does not show an agency relationship.

Similarly, a claim sufficient to "overcome the presumption of separateness afforded to related corporations," *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir. 1996)

---

[56] Plaintiffs cite to an opinion of the United States District Court for the Northern District of Illinois for the principle that agency is a question that must survive a motion to dismiss. *See Cumis Ins. Soc., Inc. v. Peters*, 983 F. Supp. 787, 796 (N.D. Ill. 1997). Plaintiffs' reliance on that case is misplaced. In *Cumis*, the district court noted that, "[w]hile the existence and extent of the agency relationship is a question of fact, the plaintiff must sufficiently allege that an agency relationship existed in order for his complaint to survive a Rule 12(b)(6) motion to dismiss." *Id.* There, the court found that the existence of an agency relationship between the plaintiff and the defendant was sufficiently pleaded where the complaint alleged that the plaintiff had made an agreement with the defendant, a collection agency, that the defendant would pursue claims on the plaintiff's behalf. *Id.* No comparable agreement is alleged in this case.

(internal quotation marks omitted), is not established by the bare allegation that one corporation dominated and controlled another.  No facts alleged in the Complaint plausibly support the inference that SPDC was a mere instrument of its corporate parents.  There is no allegation that SPDC was undercapitalized, failed to maintain corporate formalities, or that its officers ceded control to Shell, from which we might infer domination.  *See Bridgestone/Firestone*, 98 F.3d at 18.  The mere allegation that "Shell and SPDC" engaged in certain conduct does not plausibly plead specific facts which would justify treating SPDC as the alter ego of Shell.

Accordingly, on the facts alleged, the Complaint fails to plead a basis for a claim of agency or alter ego liability.

**CONCLUSION**

For the foregoing reasons, I agree with the majority that all of the claims pleaded against the Appellants must be dismissed.  I cannot, however, join the majority's creation of an unprecedented concept of international law that exempts juridical persons from compliance with its rules.  The majority's rule conflicts with two centuries of federal precedent on the ATS dating from 1795, and deals a blow to the efforts of international law to protect human rights.